EDWARD H. AND SUSAN W. ALLEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Allen v. Commissioner
Docket No. 363-85.
United States Tax Court
T.C. Memo 1988-166; 1988 Tax Ct. Memo LEXIS 194; 55 T.C.M. (CCH) 641; T.C.M. (RIA) 88166; April 21, 1988. Stephen J. Plowman, for the petitioners. Joel A. Lopata, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, by a statutory notice of deficiency dated October 4, 1984, determined deficiencies in petitioners' Federal income tax for the years 1980, 1981 and 1982, in the amounts of $ 4,204, $ 14,810.59, and $ 1,689, respectively. [1] After concessions, the issues remaining for our consideration are whether petitioners: (1) are entitled to claim losses generated by the partnership, Trans Western Airlines, for the taxable years 1980, 1981 and 19982; (2) must recognize gain resulting from *203 the transfer of the partnership business to a corporation, Trans Western Airlines of Utah, Inc.; (3) can deduct, as ordinary and necessary business expenses, amounts paid in 1982; and (4) are entitled to a $ 200 research tax credit for the 1982 taxable year. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by reference. Edward H. and Susan W. Allen, husband and wife, were residents of Logan, Utah, at the time of filing the petition herein. Petitioners are cash basis taxpayers and filed joint Federal income tax returns for the calendar years 1980, 1981 and 1982 on October 19, 1981, August 23, 1982, and April 15, 1983, respectively. [2]
During the *204 latter part of December 1977, petitioner filed papers of incorporation for Trans Western Airlines of Utah, Inc. (Corporation). [3] Before the completion of the incorporation process, however, petitioner began operating a commuter airline business. [44] Shortly thereafter, petitioner met Dennis Griffith (Griffith), who expressed an interest in becoming involved in petitioner's business. Griffith was unhappy with the lack of business structure and proposed that a partnership be formed through which to operate the airline. On January 1, 1978, pursuant to Griffith's recommendation, the partnership, Trans Western Airlines of Utah (Trans Western or Partnership), was formed. The Partnership used the accrual method of accounting. Initially, the Partnership had three general partners: Airway *205 Capital, Inc. (Airway), Air Capital, Inc., [5] and Skyview Unlimited. Mountain Valley Investments became the fourth partner in 1979. Both Skyview Unlimited and Mountain Valley Investments were owned by Griffith, whom the other partners looked to for capital. Griffith agreed to be the major financial backer of the Partnership as well as assume an active role in its development and promotion. Petitioner's interest in the partnership was held through a 58 percent interest in Airway. Airway was an electing small business corporation (Subchapter S) formed by petitioner for the purpose of allowing his family and a few friends to invest in Trans Western with limited liability. Airway was incorporated on May 4, 1978, and had a fiscal year ending March 31. The interests in Airway were owned as follows: Petitioner -- 58 percent; Carl E. Malouf -- 20 percent; L. R. Megill -- 15 percent; Dorothy Allen -- 5 percent; and Mark A. Peterson -- 2 percent. [6] Participation in the partnership was the sole activity of Airway, and the interest Airway held in the partnership was its sole asset. Petitioner was the president of Airway. *206 Upon the incorporation of Airway, petitioner's relatives and friends who were interested in investing in the airline made commitments to supply approximately $ 40,000 in capital. The percentage of these commitments actually honored is unclear from the record. It is clear, however, that Airway contributed a total of $ 17,373.80 for its interest in the partnership. No additional contributions were made to Trans Western by petitioner or the other Airway shareholders. In 1978, petitioner, acting through Airway, advanced a loan to the partnership in the amount of $ 6,117.18. Also, petitioner claimed that he made additional contributions to the partnership, through Airway, as follows: (1) by paying some of the partnership's expenses when the partnership was unable to make payment; (2) by using his personal credit cards to secure overnight accommodations for pilots who got stuck in an unscheduled city, which amounts were billed to him; and (3) by contributing an additional $ 10,000 by personal check. At its inception, *207 the partnership's only employees were petitioner and his secretary. The partnership operated one airplane it leased from petitioner. [7] The business grew steadily and by 1980 Trans Western employed approximately 60 to 75 employees and operated 12 airplanes. These airplanes were all leased from third parties, among whom were petitioner and business entities owned solely or in large part by Griffith. During the partnership's growth period its gross revenue rose to approximately $ 1.5 million. As a small airline which was not yet established, Trans Western experienced difficulty obtaining credit. In many instances the partnership could secure credit only if petitioner acted as guarantor. Petitioner's guaranty was required to obtain credit for the following: Gas, electricity, telephone, airplane repairs, payroll, shared reservations service, airline tickets, and obtaining a lease on a hanger. The payroll credit was obtained through operating loans petitioner secured with two banks in the Logan area. [8] A promissory note for each bank was admitted into evidence. The notes, executed February 22, 1980, and *208 August 29, 1980, respectively, represented loans in the amounts of $ 1,800, for 180 days, and $ 6,300 for 360 days. Credit for the shared reservation service was obtained from Frontier Airlines which booked passengers and received reservations for Trans Western. Frontier Airlines' activity accounted for a large part of Trans Western's reservations. A leased hangar, located at Logan airport, was obtained from First Security Bank for $ 170,000. None of the guarantees for these accounts were signed by petitioner on the behalf of Airways. Rather, he signed each commitment, on behalf of the partnership, in his individual capacity. The partnership incurred total net nonrecourse liabilities for the years 1978 through 19981 as follows: 1978 -- $ 166,384.72; 1979 -- $ 342,204.60; 1980 -- $ 464,994.41; and 1981 -- $ 642,455.26. [9] In determining the partnership's total liabilities to be allocated among the partners the following amounts were deducted on the partnership's *209 books as "partner loans:" 1978 -- $ 175,133.91; 1979 -- $ 518,133.91; 1980 -- $ 738,133.91; and 19981 -- $ 778,133.91. No explanation was given for this decrease in the liabilities. *210 During its taxable years 1978 through 1980 the partnership incurred substantial losses. The losses incurred for its 1978 taxable year totaled $ 253,218.51, of which $ 84,406.17 was allocated to Airway as its proportionate share. [10] The 1979 losses totaled $ 613,377.14, of which $ 153,344.28 was allocated to Airway as its proportionate share. During 1980 the partnership incurred losses totaling $ 439,212.27, of which $ 109,803.07 was allocated to Airway. The losses incurred by Trans Western in 1981 totaled $ 27,820.83, of which $ 6,955.21 was allocated to Airway as its proportionate share. Airway sought to deduct its full proportionate share of the losses in its fiscal years ending March 31, 1978 through 1982, respectively. This proceeding arose, in part, out of respondent's disallowance of these losses. The losses incurred by the partnership substantially weakened its financial position. Petitioner constantly sought ways to improve the financial condition of Trans Western. In addition, monthly meetings were held between *211 petitioner, Griffith and Waldrip to review the partnership's financial condition and to discuss potential areas of improvement. During the partnership's worst financial period, petitioner went around and personally assured its creditors that they would be paid either by Griffith, petitioner or Trans Western. Petitioner was the only partner who resided in the Intermountain West area and most of the people who did business with the airline were under the impression that petitioner was the owner. Petitioner never dissuaded these people from thinking he was the owner of the airline because he knew that many of them extended credit to and conducted business with the partnership because they relied on his business expertise for payment. Petitioner did not want them to think that in pointing out there were other partners involved he was trying to absolve himself from liability or thwart their efforts to collect any outstanding debts. In the fall of 1980 Griffith's father died and Griffith became distraught, withdrawn, and unavailable for dealing with the matters of the partnership. His participation in and support of the partnership's operations dwindled to its lowest level. This *212 lack of financial support added to the partnership's financial woes. Because Griffith had financial authority over Trans Western, his lack of participation and support made it difficult for petitioner to effectively manage the business through the partnership. The partnership was experiencing severe financial problems at this point. It became clear to everyone involved that it was necessary to restructure the business operations. Meetings were held between Griffith, petitioner, Waldrip, and occasionally some of the creditors, with respect to restructuring the business operations. Finally, it was agreed between the partners that the business operations would be transferred from the partnership to the corporation, Trans Western Airlines of Utah, Inc.[11]
The decision to transfer the partnership operations was made during late March 1981. The four partners of Trans Western transferred their interest in the partnership to the corporation on April 1, 1981, in exchange for 30,000 shares of stock in the corporation. Written documentation *213 of the transfer was completed sometime around August 22, 1981. This exchange terminated the partnership and all of its assets and liabilities, with the exception of obligations to the partners, became the assets and liabilities of the corporation. The shares of stock were divided equally between petitioner, Griffith and Waldrip. After April 1, 1981, petitioner took full control of the day-to-day operations of the corporation. At the time of the transfer, the partnership showed the following assets and liabilities on its books: Assets:
Cash in banks
$ (8,349.21)
Accounts Receivable
112,787.50 Inventory
20,817.55 Furniture & Fixtures
4,437.61 Equipment
2,240.44 Vehicles
300.00 Deposits
1,915.00 Total
$ 134,148.98 Liabilities:
Accounts Payable
$ 302,479.37 Federal Withholding
and Excise Taxes payable
45,434.00 Notes payable:
First Security Bank
33,000.00 First National Bank
7,625.03 George D. Bagley
1,436.49 Dennis Griffith
IDenco Leasing)
(payroll advance)
18,633.89 Engine overhauls
99,697.50 Total
[12] $ 642,455.26 *214 At the time of the transfer all parties involved acknowledged that there were other liabilities not accurately reflected in the records of the partnership. These unrecorded liabilities included excise and unemployment tax deficiencies and additions to tax in the following amounts: (1) $ 45,500.82 (deficiency) and $ 19,561.77 (additions) for the periods July 1, 1978 through September 30, 1978, and April 1, 1979 through March 31, 1981; (2) $ 38,421.34 (deficiency) and $ 27,956.56 (additions) for period April 1, 1979 through September 30, 1979. These tax liabilities were covered by an agreement entered into by the corporation and the partnership. The agreement provided that these liabilities remained the liabilities of the partnership and would be paid as funds became available to the corporation and transferred to the partnership. By the end of the first year of operations after the transfer of the business to the corporation, the financial condition of the airline improved. Revenues increased from $ 1.5 million to just under $ 12 million. The losses incurred by the partnerships were deducted by each partner, including Airway, and petitioners claimed their distributive share of *215 the losses through Airway. On their Federal income tax returns for the years 1980, 1981 and 1982 petitioners deducted their distributive share of the partnership losses in the following amounts: 1980 -- $ 64,465; 1981 -- $ 64,465; and 19982 -- $ 4,034. Also, on their 1982 return petitioners deducted employee business expenses in the amount of $ 3,533, and a $ 200 tax credit. The employee business expenses include expenditures made for meals and lodging, telephone, copying, postage, automobile mileage and travel. Respondent disallowed the losses, business expense deductions, [13] and the tax credit. OPINION Issue #1 - Deduction of Losses
The determination of whether petitioner may deduct losses incurred by the partnership, and if so in what amount, is made more complicated because of the tiered interest petitioner held in the partnership as a shareholder in Airway, a Subchapter S (Sub S) corporation. [14] Airway is a general partner in Trans Western. Respondent contends that petitioner *216 is not entitled to deduct any part of the partnership's losses because both Airway and petitioner were limited by their respective tax bases. Respondent argues that because Airway's basis in its partnership interest was exhausted for the years in issue, Airway could not deduct any part of Trans Western's losses, thereby precluding any of the losses from being available to petitioner through the interest he held in Airway. We must determine, therefore, what portion of Trans Western's losses are deductible by Airway, and in turn, what portion of Airway's losses are deductible by petitioner. Our task has been made more difficult because of the poor quality of the record in this case and the parties' inability to stipulate to or submit evidence on the necessary events and aspects of the partnership operations. Respondent does not dispute that the partnership incurred large losses during the years in issue. *217 Initially, we must determine what portion of the partnership losses can be claimed by Airway for the years in issue, and thus may be available for Airway's shareholders. Before we can make this determination, we must trace the computation of Airway's basis beginning with earlier years of the activity. We note at the outset that Airway's deductible share of the losses is limited by its basis in its partnership interest and the "at risk" rules. See sections 704(d) and 465. [15]
Airway's basis in its partnership interest is determined pursuant to sections 722 and 752, and section 1.752-1(e), Income Tax Regs.Section 722 provides, in relevant part, that the basis of a partner's interest acquired by contribution of money or property is the amount of such money or the adjusted basis of such property. This initial basis is adjusted for any increases or decreases in partnership *218 liabilities. Sec. 752(a) and (b). Under section 752(a), an increase in a partner's share of partnership liabilities is considered a contribution of money for purposes of section 722. Conversely, under section 752(b), any decrease in the partner's share of the partnership liabilities is treated as distribution of money by the partnership to the partner. For purposes of section 752(a) the allocation of a partnership's liabilities is governed by section 1.752-1(e), Income Tax Regs., which provides: A partner's share of partnership liabilities shall be determined in accordance with his ratio for sharing losses under the partnership agreement. In the case of a limited partnership, a limited partner's share of partnership liabilities shall not exceed the difference between his actual contribution credited to him by the partnership and the total contribution which he is obligated to make under the limited partnership agreement. However, where none of the partners have any personal liability with respect to a partnership (as in the case of a mortgage on real estate *219 acquired by the partnership without assumption by the partnership or any of the partners of any liability on the mortgage), then all partners, including limited partners, shall be considered as sharing such liability under section 752(c) in the same proportion as they share the profits. * * * Each partner's adjusted basis, at the end of each taxable year, is adjusted further as follows: Increased by, among other things, the partner's distributive share of the taxable income of the partnership, and decreased by, among other things, the partner's distributive share of the partnership losses. Sec. 705(a). [16]
*220 Section 704(a) states as a general rule that a partner shall determine his distributive share of income, gains, loss, deduction or credit according to the partnership agreement. Section 704(d) allows a partner to deduct his distributive share of the partnership loss only to the extent of his adjusted basis in the partnership at the end of the year in which the loss took place. [17]
Additionally, section 464[18] may limit the *221 deductibility of losses arising from any activity engaged in by a taxpayer in carrying on a trade or business or for the production of income, with certain exceptions. Sec. 465(a)[19] and (c). These exceptions are not applicable in this case. Under section 465, a taxpayer's deduction of losses is further limited to the amount for which the taxpayer is at risk in such activity, at the close of the taxable year. As a general rule, a taxpayer is considered at risk for the amount of money (or basis of property) that he has contributed to the activity, as well as amounts borrowed with respect to the activity. Sec. 465(b)(1). Section 465(b)(2) defines the term "borrowed amounts," for purposes of section 465, as (1) an amount borrowed for use in the activity, and (2) which created an obligation for which the taxpayer is personally liable, or has pledged assets not used in the activity as collateral for the borrowed funds. A taxpayer is not considered at risk for any amount borrowed from any person with an interest in the activity other than an interest as a creditor. Sec. 465(b)(3)(A) and (B)(i). *222 Respondent contends that Airway was not entitled to deduct *223 any losses after the close of its 1978 fiscal year because its basis in Trans Western was exhausted at this point. Respondent further contends that petitioner's basis in Airway was exhausted by the end of his 1979 calendar year, therefore, petitioner was precluded in any event from deducting any portion of the losses claimed by Airway. Respondent's determination with respect to a taxpayer's basis in a partnership interest or a Sub S corporation is presumptively correct. See J. M. Perry & Co. v. Commissioner,120 F.2d 123 (9th Cir. 1941), affg. a Memorandum Opinion of this Court. Petitioner has the burden of proving that: (1) Airway had adequate basis in its partnership interest to permit Airway to claim its proportionate share of the loses, and (2) he had sufficient basis in his interest in Airway to permit a deduction of his proportionate share of the losses claimed by Airway. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). In 1978, Airway contributed $ 17,373.80 for its interest in and made a $ 6,117.18 [20] loan to the partnership. The partnership also had nonrecourse liabilities of $ 166,384.72 for its taxable year ending March 31, 1978. *224 One-third of these liabilities ($ 55,461.57) was Airway's proportionate share. [21] Therefore, at the close of the partnership's taxable year ending March 31, 1978, Airway's basis in its partnership interest was $ 78,952.55. [22] See sections 722, 752 and 1.752-1(e), Income Tax Regs.
Pursuant to section 704(a) Airway's proportionate share of the $ 253,218.51 loss incurred by the partnership for its taxable year ending March 31, 1978, was $ 84,406.17. However, section 704(d) limits Airway's deductible portion of this loss to its basis in the partnership, or $ 78,952.55. Therefore, pursuant to sections 704(d) and 705(a)(2)(A) *225 Airway's basis was reduced to zero by its allowable share of the partnership loss. The "at risk" provisions of section 465, however, limit the amount of loss Airway could claim, and pass through to its shareholders. Because Airway's contribution and loan of $ 23,490.98 was the only portion of its basis in the partnership interest for which it was "at risk" within the meaning of section 465, only $ 23,490.98 of the $ 84,406.17 loss allocated to Airway, for its taxable year ending March 31, 1978, could be allowed to pass through Airway to its shareholders. The excess of Airway's proportionate share of the loss over the amount claimed by Airway in the amount of $ 55,461.57 ($ 78,952.55 - $ 23,490.98) is subject to the carryover provisions of section 465(a)(2). This section permits such losses to be carried over to the succeeding taxable years. These losses will be deductible when the taxpayer injects more funds into the activity. At the beginning of its taxable year ending March 31, 1979, Airway's carryover basis in its partnership interest was zero. During that year the partnership had an increase in liabilities of $ 175,819.88 ($ 342,204.60 - $ 166,384.72), [23] of which one-fourth *226 ($ 43,954.97) was allocated to Airway and treated, pursuant to section 752(a), as an additional contribution by Airway. Accordingly, at the end of its taxable year ending March 31, 1979, Airway's basis in Trans Western was $ 43,954.97. The total loss incurred by the partnership for its 1979 taxable year was $ 613,377.14, of which $ 153,344.28 (one-fourth) was Airway's proportionate share. Under sections 704(d) and 705(a)(2)(A) Airway's basis was reduced to zero by its allowable share of the partnership losses. [24] Because Airway's basis in its partnership interest was comprised of amounts attributable solely to the partnership's nonrecourse liabilities, Airway was not "at risk" for any amounts of which its basis was comprised. [25] Therefore, no part of Airway's allowable share of the partnership losses, incurred for its 1979 taxable year, could be claimed by Airway. [26] Consequently, no part of this loss became available to Airway's shareholders, including petitioner. Airway's section 465(a)(2) carryover losses for its taxable year ending March 31, 1979, were $ 43,954.97. *227 At the beginning of its taxable year ending March 31, 1980, Airway's basis in its partnership interest was zero. During this taxable year the liabilities of Trans Western increased by $ 122,789.81 ($ 464,994.41 - $ 342,204.60), of which $ 30,697.45 (one-fourth) was Airway's proportionate share. Pursuant to section 752(a), Airway's basis in TransWestern increased to $ 30,697.45 at the end of the taxable year ending March 31, 1980. The total loss incurred by the partnership for its 1980 taxable year was $ 439,212.27, of which $ 109,803.07 (one-fourth) was Airway's proportionate share. Under sections 704(d) and 705(a)(2)(A) Airway's allowable loss was $ 30,697.45, which decreased its basis in the partnership interest to zero. Airway was limited, however, in the amount of the 1980 loss it could claim because its basis in the partnership was composed solely of amounts attributable to the nonrecourse liabilities of the partnership. These amounts did not constitute amounts for which Airway was "at risk" within the meaning of section 465 because they were not amounts contributed to the activity by Airway, nor were they amounts borrowed for which Airway was liable. Therefore, the amount *228 of the 1980 loss which could be claimed by Airway, and passed through to its shareholders, was limited to zero. Airway's carryover losses, pursuant to section 465(a)(2), for its taxable year ending March 31, 1980, were $ 30,697.45. At the beginning of its taxable year ending March 31, 1981, Airway's carryover basis in its interest in Trans Western was zero. During that taxable year the partnership liabilities increased by $ 177,460.85 ($ 642,455.26 - $ 464,994,41), of which $ 44,365.21 [27] (one-fourth) was Airway's proportionate share. As a result, at the end of the 1981 taxable year Airway's basis in Trans Western was $ 44,365.21. For the taxable year ending March 31, 1981, Trans Western incurred losses in the amount of $ 27,820.83, of which $ 6,955.21 was Airway's proportionate share. Airway's allowable share of the loss decreased its basis to $ 37,410 ($ 44,365.21 - $ 6,955.21). Because Airway's basis of $ 44,365.21 (prior to reduction under section 705(a)(2)(A)) consisted solely of amounts attributable to nonrecourse liabilities of Trans Western, for which Airway was not "at risk," no portion of the 1981 loss allowable *229 to Airway could be claimed by Airway and passed through to its shareholders. Airway's section 465 carryover losses for the taxable year ending March 31, 1981, totaled $ 6,955.21. We are cognizant that the partnership operations were transferred to the corporation on April 1, 1981. [28] This transfer produced some significant tax consequences which affected the amount of partnership losses available to Airway in its 1982 taxable year. We discuss these tax consequences in a later part of this opinion under the issue involving Airway's recognition of gain from the transfer. The second step in our analysis focuses on whether any portion of the partnership losses is deductible by petitioner, as a shareholder of Airway. For purposes of computing petitioner's basis in Airway we accept respondent's allocation to petitioner of all funds contributed to Airway. Accordingly, at the end of petitioner's 1978 taxable year his basis in Airway was $ 23,490.98. [29]
Unlike Airway, petitioner's *230 deduction of any portion of the losses generated by the partnership is governed, in large part, by section 1374[30] as in effect during the years in issue. [31] We consider here what appears to be an issue of first impression concerning the interplay of sections 701 through 755 (governing the taxation of partnerships and their partners) and sections 1371 through 1379 (governing the taxation of Sub S corporations and their shareholders). We specifically consider the availability of losses, generated by a partnership, to second-tier partners who hold their partnership interest through a Sub S corporation. *231 Although Airway's deduction of the losses incurred by Trans Western during the taxable years in issue was governed, in large part, by sections 704, 722, 752 and 465, the business form through which petitioner chose to hold his interest in Trans Western will require the application of a different set of rules to petitioner. After losses are claimed by Airway, they become available for deduction by Airway's shareholders, including petitioner, subject to the provisions governing the treatment of Sub S corporations and their shareholders. Section 1374(b), as in effect for the years in issue, provided that a shareholder of a Sub S corporation may deduct his pro rata share of the corporation's net operating loss. Section 1374(c)(2) limited this deduction to the sum of (1) the adjusted basis of the shareholders's stock in such corporation, and (2) the adjusted basis of any indebtedness of the corporation to the shareholder. Therefore, the portion of the partnership losses petitioner can deduct for his taxable years depends on Airway's net operating loss, produced by deducting its share of the partnership losses, and petitioner's basis in his Airway interest at the end of each taxable *232 year. Airway, through its participation in the partnership, incurred a deductible loss of $ 23,490.98, for its taxable year ending March 31, 1978. Petitioner, as an owner of 58 percent interest in Airway, was entitled to deduct his proportionate share of Airway's loss in the amount of $ 13,624.77. [32] Because petitioner's basis in his Airway interest was $ 23,490.98 at the end of his 1978 taxable year, the full amount of his proportionate share of this loss was deductible by petitioners on their 1978 tax return. [33]
At the beginning of petitioner's 1979 taxable year his carryover basis in his Airway interest was $ 9,866.68 ($ 23,490.98 - $ 13,624.30). However, because of the limitations imposed by sections 704(d) and 465, Airway was unable to claim any part of the losses available to it for the taxable years ending March 31, 1979, 1980 and 1981. Consequently, Airway had no net operating losses *233 for its taxable years 1979, 1980 and 1981. Therefore, no loss was available to petitioner, through Airway, for his 1979, 1980 and 1981 taxable years. We uphold respondent's disallowance of petitioner's deduction of partnership losses for his 1980 and 1981 taxable years. Petitioner admits that he made no direct contributions to Airway other than his initial contribution of $ 17,373.80 and the loan of $ 6,117.18. He contends, however, that he should be allowed deductions both for amounts he purportedly loaned directly to the partnership and the liabilities of the partnership which he guaranteed. [34] Deductions for these amounts can be allowed only if such amounts are considered to be part of petitioner's basis in Airway. Sec. 1374(c). *234 Among the amounts petitioner claimed he loaned Trans Western is $ 10,000 in either 1978 or 1979. This loan is not reflected in the partnership's nor petitioner's records. Furthermore, even if established, such a loan could not be considered as part of petitioner's basis in Airway because the loan would not have been transacted directly between petitioner and the partnership.[35] Such an arrangement falls short of the section 1374(c)(2) threshold. Under section 1374(c)(2) the shareholder can obtain the benefit of indebtedness added to his basis in the interest he holds in the corporation, but the indebtedness must run directly from the corporation, but the indebtedness must run directly from the corporation to the shareholder. See Frankel v. Commissioner,61 T.C. 343, 349 (1973), affd. without published opinion 506 F.2d 1051 (3d Cir. 1974). Therefore, the $ 10,000 loan, even if found to be made, cannot be considered a part of petitioner's basis in Airway. *235 Also, we are unable to agree that the amounts representing service accounts guaranteed by petitioner should be considered part of petitioner's basis in Airway. As respondent correctly argues, petitioner must make actual disbursements on the corporation's indebtedness before he can increase his basis for purposes of deducting his proportionate share of Airway's net operating loss. Brown v. Commissioner,706 F.2d 755 (6th Cir. 1983), affg. a Memorandum Opinion of this Court. It is well-settled that a shareholder's guaranty of a debt, even where such shareholder is primarily liable, does not give rise to indebtedness from the corporation to the shareholder, within the meaning of section 1374(c)(2)(B). Raynor v. Commissioner,50 T.C. 762, 770-771 (1968). See also Borg v. Commissioner,50 T.C. 257, 264 (1968). Where there is indirect borrowing involved the shareholder can secure such borrowing as an increase in his basis only by paying part or all of the obligation. Upon payment, the amount paid gives rise to an increase in the shareholder's *236 basis for purposes of deducting his proportionate share of the corporation's loss. Estate of Leavitt v. Commissioner,90 T.C. 206, 211 (1988) (Court reviewed). See also Putman v. Commissioner,352 U.S. 82 (1956); Underwood v. Commissioner,535 F.2d 309 (5th Cir. 1976), affg. 63 T.C. 468 (1975); Raynor v. Commissioner,50 T.C. 762 (1968). Furthermore, even if petitioner had made payments on the accounts he guaranteed, such payments could not be used to increase petitioner's basis under section 1374(c)(2)(B) because petitioner acted in his individual capacity when he guaranteed these debts. The debts were not petitioner's, nor did petitioner, at any time, act in his capacity as a shareholder or officer of Airway. [36] Rather, petitioner obligated himself, personally, on a number of the partnership's service accounts. These accounts were applied for and obtained on the behalf of and in the name of the partnership. All payments on the accounts were made by the partnership. We cannot now ignore the form of the transaction adopted by petitioner. Because petitioner did not act as the agent for or *237 as a shareholder of Airway, to accept petitioner's argument would require us to disregard the Airway corporate entity and imply petitioner's actions directly from him to the partnership as a first-tier partner. This we cannot do. For tax purposes a corporate form is usually respected, but may be disregarded in rare instances where it is found that the corporation is a sham or unreal. See Moline Properties v. Commissioner,319 U.S. 436 (1943); Higgins v. Smith,308 U.S. 473, 477-478 (1940); Gregory v. Helvering,293 U.S. 465 (1935). We see no reason to disregard the corporate form *238 in this case. Although Airway was a Sub S corporation and its shareholders treated like partners for tax purposes, Airway is a viable corporate entity. Airway had a business purpose and was created by petitioner for his advantage. It had a special function in the structure and operation of the airline. The corporate entity chosen by petitioner must be recognized even where the tax consequences are unfavorable to petitioner. We recognize that petitioner acted out of business exigencies in his dealings with the partnership and many of its creditors. Petitioner, however, held his interest in Trans Western through Airway, and therefore, can derive tax benefits from the losses incurred by Trans Western only through Airway. Because petitioner guaranteed many of the partnership's accounts in his individual capacity and not as a shareholder of or officer for Airway, and because Airway cannot be ignored as a valid corpoorate entity, we hold that none of the amounts guaranteed by petitioner for the partnership can be considered part of his basis in Airway. The total deduction of losses generated by Trans Western which can be deducted by petitioner is limited to his basis in Airway of *239 $ 23,490.98 ($ 17,373.80 + 6,117.18). Petitioner contends that even if we find that his basis in Airway was not increased by amounts owed by Trans Western on the accounts he guaranteed, he must be considered to be "at risk" within the meaning of section 465 for the approximate monthly expenses of the partnership. Should we accept petitioner's argument on this point, petitioner will seek to deduct the losses disallowed by respondent based upon petitioner's indirect relationship with the partnership. The monthly service expenses of the partnership averaged approximately $ 50,000. Petitioner argues that this was the extent of his financial exposure for any given month of the years in issue. Petitioner contends that the liability for these amounts rested squarely on his shoulders. Petitioner has failed, however, to show how these liabilities were incurred by him in a manner sufficient to meet the standards of section 465. A taxpayer is generally considered to be "at risk" as to any amounts borrowed for use in an activity with respect to which the taxpayer has personal liability for *240 payment from his personal assets. Sec. 465(b)(2). Respondent does not dispute the fact that petitioner executed guarantees for many of the service related credit lines of the partnership. On the contrary, respondent argues that although petitioner has shown that he guaranteed these accounts, petitioner has failed to show that he personally borrowed such sums or that he was personally liable for the repayment of these amounts. The credit accounts were all established in the name of the partnership. In all instances, the credit was extended to the partnership and the liabilities created through these accounts were paid by the partnership. [37] We note that petitioner testified that he was unsure whether he was personally liable under the guarantees he executed. Yet, for purposes advantageous to him, petitioner now asks us to interpret these guarantees as imposing personal liability on him. We find no evidence to support such a finding. We hold, therefore, that petitioner was not "at risk" within the meaning of section 465 for the amounts for which he executed guarantees. *241 Petitioner contends that he should be considered "at risk" under the "ultimate liability" test set forth in Smith v. Commissioner,84 T.C. 889 (1985). Petitioner's reliance on Smith is misplaced. In Smith the "ultimate liability" test was applied to adjustments of the partner's basis in his partnership interest. Although a similar test was applied to the "at risk" provisions in Abramson v. Commissioner,86 T.C. 360 (1986), a case upon which petitioner also relies, Abramson states that a taxpayer is not "at risk" with respect to a guarantee if he is protected against economic loss. See also S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 87. In the instant case petitioner could seek indemnification from any one of the four general partners of Trans Western for any amounts he was required to pay on the behalf of the partnership. [38] Moreover, petitioner consistently held that the debts of the partnership were the obligation of the partnership, and subsequently, the obligation of the corporation through the April 1, 1981, transfer. *242 We hold, therefore, that because petitioner was protected against economic loss for any amounts he could be called upon to pay on the behalf of the partnership that the "ultimately liability" test applied in Abramson is not applicable to the instant case. *243 Issue #2 - Gain Recognition
Respondent concedes, with one exception, that the April 1, 1981, transfer of the partnership's assets and liabilities to the corporation qualifies under section 351(a). Section 351(a) provides nonrecognition treatment for property transferred solely in exchange for stock or securities of a controlled corporation. [39] This nonrecognition treatment is subject to the special rule set forth in section 357(c) for the assumption of liabilities. [40]
*244 Respondent argues that because the liabilities assumed exceeded the total adjusted basis of the property transferred, the partnership must recognize gain pursuant to section 357(c). We agree with respondent. For purposes of computing Airway's gain pursuant to section 357(c), we treat the partnership interest as the property Airway transferred to the corporation. [41] The total liabilities of the partnership assumed by the corporation equaled $ 642,455.26, and Airway's proportionate share was $ 160,613.82. [42] At the time of the transfer, Airway's basis in its partnership interest was $ 37,410. [43] Thus, the excess liabilities assumed by the corporation attributable to Airway was $ 123,203.82. Consequently, Airway must recognize gain, pursuant to section 375(c), in the amount of $ 123,203.82 ($ 160,613.82 - $ 37,410). *245 However, for purposes of section 465, deductions allocable to an activity which are otherwise allowable are deductible to the extent that income is received or accrued from the activity. Income received or accrued from an activity includes gain recognized upon the disposition of the activity or an interest in the activity. [44] The gain Airway must recognize pursuant to section 357(c) is income Airway contributed to the activity for purposes of section 465. Therefore, Airway is considered to have $ 123,203.82 "at risk" in the partnership. The section 465 suspended losses for the taxable years ending March 31, 1978, 1979, 1980 and 1981, up to the amount of $ 123,203.82, can be claimed by Airway in its taxable year ending March 31, 1982. Airway's suspended losses totaled $ 137,069.20 ($ 55,461.57 + 43,954.97 + 30,697.45 + 6,955.21). Therefore, Airway can deduct in its taxable year ending March 31, 1982, section 465 suspended losses in the amount of $ 123,203.82. The deduction of these losses eliminates any gain that would have been otherwise taxable to Airway for its taxable year ending *246 March 31, 1982. Consequently, any gain that would otherwise flow through to Airway's shareholders, including petitioner, is eliminated. No part of the gain resulting from the transfer of the partnership's assets and liabilities is taxable to petitioner. During petitioner's 1982 taxable year the operations of the partnership were conducted by the corporation; therefore, both Airway and petitioner are precluded from deducting any part of the losses incurred by the corporation after April 1, 1981. Losses incurred by the corporation did not flow through to its shareholders. Airway was allowed losses in the amount of $ 123,203.82 for its 1982 taxable year. However, these losses were offset against the gain Airway recognized under section 357(c). Therefore, Airway did *247 not have any operating loss during 1982 which flowed through to its shareholders, including petitioner. Petitioner has a basis in his interest in Airway of $ 9,866.21. [45]
Section 752 deems as a distribution of money any decreases in a partner's share of the partnership liabilities. Section 733 requires a partner to decrease his basis (but not below zero) by the amount of any money distributed to such partner. If such distribution exceeds the adjusted basis of the partner's interest, determined immediately before the distribution, section 731(a)[46] requires such partner to recognize gain in the amount of the excess. *248 At the time of the transfer, Airway's adjusted basis in its partnership interest was $ 37,410. Because Airway had recognized gain of $ 123,203.82, pursuant to section 357(c), Airway must increase its basis by such gain, pursuant to section 705. Airway's basis is increased to $ 160,613.82 ($ 37,410 + $ 123,203.82). Under section 752, Airway is deemed to have received a distribution of $ 160,613.82. Consequently, Airway must decrease its basis (but not below zero) by the amount of the distribution. Pursuant to section 733, Airway's basis is decreased to zero with no resulting excess distribution for purposes of section 731(a). Airway had no gain pursuant to section 731(a). Issue #3 - Deduction of Business Expenses
Respondent disallowed business expenses claimed by petitioner on his 1982 tax return in the amount of $ 3,533. These expenses included expenditures made for meals and lodging, telephone, copying, postage, automobile mileage and travel. Petitioner testified that the travel expenses were incurred by him through his efforts to leverage the purchase of another airline (Hawaiian Airlines), and his investment in a geothermal pump project. Respondent contends that *249 petitioner has failed to demonstrate that the expenses involved herein were "ordinary and necessary" within the meaning of section 162. Whether the amounts disallowed by respondent constituted ordinary and necessary expenses incurred in the operation of petitioner's trade or business is a question of fact to be determined from the evidence presented, with the burden being on petitioner to overcome the presumed correctness of respondent's determination. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Section 162(a) provides, in pertinent part, as follows; (a) IN GENERAL. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including -- * * * (2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business, * * *
*250 To qualify as an allowable deduction the expenses must be both "ordinary" and "necessary" within the meaning section 162. In Deputy v. du Pont,308 U.S. 488, 495 (1940), the Supreme Court held that the word "ordinary" as used in section 162 has "the connotation of normal, usual, or customary." In Commissioner v. Tellier,383 U.S. 687, 689 (1966), the Supreme Court held that the term "necessary," as used in the contest of section 162, has been consistently construed to impose "only the minimal requirement that the expense be 'appropriate and helpful' for the development of the [taxpayer's] business." At trial petitioner presented summary sheets which listed the disallowed expenses by category and amount. Petitioner testified with specificity with respect to each of the disallowed amounts for postage, copying, telephone and automobile milage expenses. We hold that petitioner's testimony along with the evidence presented carries his burden of proof with respect to these expenses. Consequently, petitioner may deduct expenses for postage, copying, telephone and automobile mileage. With respect *251 to the expenses incurred for travel, including meals and lodging, section 1.162-2(a), Income Tax Regs., provides as follows: Traveling expenses include travel fares, meals and lodging, and expenses incident to travel such as expenses for sample rooms, telephone and telegraph, public stenographers, etc. Only such traveling expenses as are reasonable and necessary in the conduct of the taxpayer's business and directly attributable to it may be deducted. If the trip is undertaken for other than business purposes, the travel fares and expenses incident to travel are personal expenses and the meals and lodging are living expenses. If the trip is solely on business, the reasonable and necessary traveling expenses, including travel fares, meals, and lodging, and expenses incident to travel, are business expenses. * * * Whether a trip is related primarily to the taxpayer's business depends upon the facts and circumstances in each case. Sec. 1.162-2(b)(2), Income Tax Regs. Petitioner has the burden of proving that these travel expenses *252 were related primarily to his business of operating the airline. Additionally, section 274(d) imposes more stringent substantiation requirements on the deduction of travel expenses. Section 274(d) provides that no deduction is allowed under section 162 for any travel expense (including meals and lodging while away from home) unless the taxpayer substantiates these expenses with adequate records or sufficient evidence corroborating his own testimony. Petitioner testified that the travel expenses herein involved were incurred as a result of his efforts to leverage the purchase of another airline to help the failing financial condition of the partnership. Although we recognize that petitioner's motives were for business, we find that he failed to adequately substantiate his travel expenses for purposes of section 274(d). Therefore, respondent's disallowance of these expenses will be sustained. Issue #4 - Availability of Research Tax Credit
On his 1982 tax return petitioner claimed a credit in the amount of $ 200 pursuant to section 44F. [47] Respondent disallowed the full amount *253 of the credit and contends that petitioner has not shown that he qualifies for such credit. Respondent's determination is presumptively correct. Petitioner bears the burden of proof with respect to his entitlement to the disallowed credit. Welch v. Helvering,290 U.S. 111 (1933); Rule 142.
Generally, a taxpayer is entitled to a research tax credit, pursuant to section 44F, in an amount equal to 25 percent of the excess of the qualified research expenses for the year over the average base period research expenses for the relevant preceding tax years. As pertinent herein, section 44F requires the taxpayer to show that he has incurred expenses for "in-house" research, [48] which includes wages paid or incurred to an employee *254 for "qualified services" performed by the employee. [49] Therefore, to claim a tax credit under section 44F, petitioner must demonstrate that (1) he engaged in research or experimental activities, [50] (2) which were conducted in connection with his trade or business, and (3) that the expenses he seeks to deduct were expended in connection with such activities. *255 Petitioner testified that the research credit was claimed in connection with his investment in a geothermal pump project. Petitioner testified that he was the principal in a small company which owned an interest in a major geothermal resource, a producing well, in Utah. He claimed that one of the problems they encountered in this project was the pumping of fluid out of the well with a pump that would last for a long time. To solve this problem, he and some other members of the firm came up with an idea for a geothermal pump which they had patented. Petitioner testified that he paid a pro rata share of the costs for the parts for the working model of the pump and a pro rata share of the patent attorney's expense. [51]
Respondent contends that petitioner has not substantiated the amounts expended on this activity during the 1982 taxable year, and that he failed, also, to show that such amounts are qualified research expenses. Petitioner merely presented a series of canceled checks which *256 he separated into two categories -- patent attorney's expenses and costs for components for the pump. Respondent contends that this information is insufficient to meet petitioner's burden. We agree. Petitioner's testimony and the evidence presented on this issue is insufficient to meet his burden of showing that the expenses were incurred in the actual conduct of a research or experimental activity. Moreover, petitioner has failed to provide sufficient information on the base period research expenses. These research expenses are a necessary component of the computation of the research tax credit, and could act as a limitation upon an otherwise available credit. Petitioner argues, in the alternative, that should we determine that the research credit is unavailable to him that the expenses incurred in connection with this project should be allowed as a deduction pursuant to section 162. [52] We disagree. *257 Petitioner has failed to establish that these expenses were paid or incurred in a trade or business that was being carried on at the time the expenses were paid, and that these expenses were directly related to such trade or business. [53] Moreover, petitioner has failed to show that these expenses were in fact paid or incurred in the year for which he seeks a deduction. [54] We hold for respondent on this issue. To reflect concessions made by the parties, Decision will be entered under Rule 155.
Footnotes
1. In his amended answer, respondent asserts an increased deficiency for the 1982 taxable year in the amount of $ 16,202. Respondent bears the burden of proof with respect to this increase. Rule 142(a), Tax Court Rules of Practice and Procedure.↩
2. Petitioner, Susan W. Allen, is a party to this proceeding solely by filing a joint tax return with her husband. All references to petitioner, singularly, are to Edward H. Allen. ↩
3. During the incorporation process petitioner transferred $ 100 to the corporation to pay the filing fees and incidental expenses. Immediately after incorporation the entity was abandoned as the form through which the airline would operate. The corporation sat idle for about 3-1/2 years. ↩
44. We assume petitioner operated the business as a proprietorship before the formation of the partnership. ↩
5. Air Capital, Inc., was owned by Steward T. Waldrip. ↩
6. Carl Malouf was a long-time friend of petitioner as well as his attorney. Mark Peterson was a long-time business associate. Dorothy Allen was petitioner's mother. ↩
7. A lease was executed between petitioner and the partnership on Dec. 17, 1977. ↩
8. At trial, petitioner pointed out that, initially, the loans were extended to him and the partnership jointly, but later it became clear that the banks were extending the loans to him on the behalf of the partnership. ↩
9. Exhibit 13-M sets forth the liabilities of the partnership for the taxable years 1978, 1979, 1980 and 1081. The parties and the Court have relied upon Exhibit 13-M for taxable years 1978, 1979 and 1980. As to the 1981 taxable year, in addition to Exhibit 13-M which shows liabilities of $ 500,658.64 for 19981, we have access to the partnership's books and records which reflect liabilities in the amount of $ 642,455.26, for the same taxable year. Although this is no reflection on the figures set forth in Exhibit 13-M, we view the total liabilities for 1981, as set forth in the partnership's books and records, more controlling and will use them in our computations with respect to partners' basis in their interest and the liabilities assumed by the corporation on Apr. 1, 1981. (See note 12, infra.↩) The use of the liabilities in the larger amount does not significantly affect the outcome of the case. Therefore, we will not apply the figure as set forth in Exhibit 13-M for the 19981 taxable year as respondent seeks to do. 10. During the partnership's 1978 taxable year, Airway was a one-third partner. For taxable years 1979 through 1981 Airway was a one-fourth partner. ↩
11. The corporate shell was activated to receive the business operations of the partnership. Prior to this the corporation had been inactive. ↩
12. See note 9, supra.↩
13. The disallowance of these deductions and the resulting increase in petitioner's gross income resulted in automatic mathematical adjustments to petitioners' medical expense deductions. ↩
14. In the Subchapter S Revision Act of 1982, Congress revised the rules governing Sub S corporations. Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669. Because the revisions as set forth in the 1982 Act apply to taxable years beginning after Dec. 31, 1982, they are not applicable in this case. ↩
15. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
16. Sec. 705(a) provides, in pertinent part, as follows: (a) GENERAL RULE. -- The adjusted basis of a partner's interest in a partnership shall, except as provided in subsection (b), be the basis of such interest determined under sec. 722 (relating to contributions to a partnership) or sec. 742 (relating to transfers of partnership interests) -- * * * (2) decreased (but not below zero) by distributions by the partnership as provided in section 733 and by the sum of his distributive share for the taxable year and prior taxable years of -- (A) losses of the partnership, and (B) expenditures of the partnership not deductible in computing its taxable income and not properly chargeable to capital account, and (3) decreased (but not below zero) by the amount of the partner's deduction for depletion under section 611 with respect to oil and gas wells. ↩
17. Sec. 705(d) provides as follows: (d) LIMITATION ON ALLOWANCE OF LOSSES. -- A partner's distributive share of partnership loss (including capital loss) shall be allowed only to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which such loss occurred. Any excess of such loss over such basis shall be allowed as a deduction at the end of the partnership year in which such excess is repaid to the partnership. ↩
18. Sec. 465↩ was added to the Code by the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1531, and is applicable to taxable years beginning after Dec. 31, 1975. It was enacted to combat a perceived abuse which allowed a taxpayer to deduct tax losses in excess of the amount of his economic investment. S. Rept. 94-938 (1976), 1976-3 C.B/ (Vol. 3) 49, 86. 19. For the years in issue sec. 465(a)(1) provided, in pertinent part, as follows: (a) LIMITATION TO AMOUNT AT RISK. -- (1) IN GENERAL. -- In the case of -- (A) an individual, (B) an electing small business corporation (as defined in section 1371(b)), and (C) a corporation with respect to which the stock ownership requirement of paragraph (2) of section 542(a) is met, engaged in an activity to which this section applies, any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk (within the meaning of subsection (b)) for such activity at the close of the taxable year. ↩
20. For purposes of computing Airway's partnership basis and petitioner's interest in Airway, we treat this liability as being fully assumed solely by petitioner. Therefore, in determining Airway's basis in Trans Western and petitioner's basis in Airway we will use the $ 17,373.80 amount plus the loan. ↩
21. See discussion on page 6 and note 9, supra.↩
22. Airway's basis is computed as follows: ↩
Initial contribution
$ 17,373.80
Loan to partnership
6,117.18
One-third of liabilities
55,461.57
Total basis
$ 78,952.55
23. See discussion on page 6. ↩
24. The excess of Airway's proportionate share of the partnership losses over its allowable amount can be carried forward to succeeding taxable years in which the excess loss is repaid. See sec. 704(d)↩. 25. No part of Airway's basis in Trans Western constituted funds or property contributed by Airway or amounts borrowed for which Airway was liable. ↩
26. The "at risk" provisions do not affect the computation of a partner's basis. See sec. 1.465-(1)(e), Proposed Income Tax Regs., 44 Fed. Reg. 32247 (June 5, 1979); H. Rept. 94-658 (1976), 1976-3 C.B. (Vol. 2) 799. See also sec. 705(a)(2)(A)↩. 27. See discussion at page 6 and note 9, suprs.↩
28. The late completion of the written documentation for the transfer of the business operations to the corporation does not materially affect the outcome of this case. ↩
29. See note 17, supra.↩
30. For the years in issue the secs. governing the taxation of Sub S corporations were secs. 1371 through 1379. These secs. have been redesignated by Pub. L. 97-354, 96 Stat. 1669, for taxable years beginning after 1982. ↩
31. Sec. 1374 provided, in pertinent part, as follows: (a) GENERAL RULE. -- A net operating loss of an electing small business corporation for any taxable year shall be allowed as a deduction from gross income of the shareholders of such corporation in the manner and to the extent set forth in this section. (b) ALLOWANCE OF DEDUCTION. -- Each person who is a shareholder of an electing small business corporation at any time during a taxable year of the corporation in which it has a net operating loss shall be allowed as a deduction from gross income, for his taxable year in which or with which the taxable year of the corporation ends * * * an amount equal to his portion of the corporation's net operating loss * * *. The deduction allowed by this subsection shall, for the purposes of this chapter, be considered as a deduction attributable to a trade or business carried on by the shareholder. (c) DETERMINATION OF SHAREHOLDER'S PORTION. -- (1) IN GENERAL. -- For purposes of this section, a shareholder's portion of the net operating loss of an electing small business corporation is his pro rata share of the corporation's net operating loss * * * for his taxable year in which or with which the taxable year of the corporation ends. For purposes of this paragraph, a shareholder's pro rata share of the corporation's net operating loss is the sum of the portions of the corporation's daily net operating loss attributable on a pro rata basis to the shares held by him on each day of the taxable year. For purposes of the preceding sentence, the corporation's daily net operating loss is the corporation's net operating loss dividend by the number of days in the taxable year. (2) LIMITATION. -- A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of -- (A) the adjusted basis * * * of the shareholder's stock in the electing small business corporation, determined as of the close of the taxable year of the corporation, * * * and (B) the adjusted basis * * * of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation * * *. ↩
32. Airway had no other source of income or deductions other than its partnership interest in Trans Western. ↩
33. Because Airway's fiscal year ended on Mar. 31, the losses deducted by Airway would be deducted by petitioner in the calendar year in which Airway's fiscal year ended. ↩
34. At trial, petitioner testified that he considered himself personally liable on the credit guarantees but was unsure whether he was legally liable. Petitioner contended that he considered himself liable for the total expenses of the day-to-day operations. These expenses had a monthly average as follows: payroll -- $ 35,000; hotel accommodations -- $ 600; telephone -- $ 4,000; utilities -- $ 400; airplane fuel -- $ 23,000; maintenance parts -- $ 5,000; lease payments -- $ 3,000; and airline ticket -- $ 200. He testified that he was required to pledge his home as security with the company that supplied Trans Western with fuel for the airplanes. This policy was later abandoned by the fuel company. Petitioner contends that because he was personally liable on the guarantees, the amounts paid under the guarantees should be considered as his additional contribution to the partnership. ↩
35. The other means by which petitioner may deduct such a loan, if established, would be pursuant to sec. 166. Petitioner has the burden of showing that the debt was a real debt and that it became a bad debt in the year petitioner seeks to deduct such amount. However, petitioner has not shown that he was entitled to a bad debt deduction. See sec. 166(a) and (d). ↩
36. Although petitioner's guaranty was required for Trans Western's service accounts such as gas, electricity, telephone, airplane repairs, payroll, shared reservations service and airline tickets, these accounts were obtained in the name of the partnership and all amounts incurred on them were paid by the partnership. Petitioner has not produced any evidence to substantiate his claim that some of the amounts incurred on these accounts were paid by him. ↩
37. Petitioner testified that, on occasion, he paid some of the debts of the partnership that were either billed to him on his personal credit cards or paid by him during one of the partnership's bad financial periods. However, petitioner has not produced any evidence to substantiate his claim. ↩
38. From the events surrounding respondent's efforts to collect a delinquent debt for Federal withholding and excise taxes we find evidence to support our belief that petitioner would actually resist being held liable for the partnership's debts and would seek indemnification for any amounts he was called upon to pay on the behalf of the partnership. Petitioner testified that he represented to every agent of the Internal Revenue Service that the debt was the legitimate obligation of the corporation, for which he was not responsible. Petitioner testified, further, that he left the corporation for a period of time because he had lost confidence in the shareholders who had taken the position that because the Internal Revenue Service was seeking to collect the tax liability from petitioner, which he resisted, there was potential conflict of interest for petitioner to continue in his position with the corporation. During respondent's efforts to collect the payroll taxes petitioner consistently maintained that the taxes were the obligation of the partnership and, subsequently, that of the corporation. Petitioner refused to pay any part of this debt, and appeared to by annoyed at the thought that respondent would seek to hold him liable. ↩
39. At trial, and in both his opening and reply briefs, respondent argued that the transfer of the partnership's business to the corporation did not qualify for nonrecognition of gain pursuant to sec. 351(a). By Notice of Concession, filed Oct. 1, 1986, respondent conceded this issue. Therefore, we will not address any of the arguments respondent made with respect to the issue of the nonapplication of sec. 351↩ in this case. 40. Sec. 357(c) provides, in pertinent part, as follows: (c) LIABILITIES IN EXCESS OF BASIS. -- (1) IN GENERAL. -- In the case of an exchange -- (A) to which section 351 applies, or (B) to which section 361 applies by reason of a plan of reorganization within the meaning of section 368(a)(1)(D), if the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be. ↩
41. Generally, Airway's proportionate share of the basis of the assets transferred (inside basis). Airway's proportionate share of the total adjusted basis of the assets transferred to the corporation was $ 33,712.26, and the basis in its partnership interest at the date of the transfer was $ 37,410. Because Airway did not purchase its partnership interest, the inside and outside basis, generally, should correspond. We attribute this discrepancy in bases to petitioner's inadequate record keeping. We do not place great emphasis on the difference in figures here because it does not materially affect the outcome of this case. ↩
42. Respondent argues on brief that Airway's proportionate share of the liabilities assumed by the corporation was $ 124,164.66, and points to Exhibit 15-O as support for this figure. Exhibit 15-O shows each partner's share of the partnership liabilities assumed by the corporation as $ 125,164.66 for a total of $ 500,658.64. This figure has not been used in our computation of Airway's basis in Trans Western, and it will not be used in computing Airway's percentage of the gain triggered by section 357(c). (See note 9, supra↩). 43. Respondent argues that at the time of the transfer, Airway's adjusted basis in its partnership interest was $ 1,960.85. As support of this contention respondent points to Exhibit 14-N which contains this figure. Exhibit 14-N sets forth, as each partner's basis, an amount which includes the very losses respondent disallowed. We are unable to agree with respondent that this is the correct figure to be used for Airway's basis. ↩
44. See Proposed Income Tax Regs. sec. 1.465-12(a), 44 Fed. Reg. 32240 and 1.465-66(a), 44 Fed. Reg. 32249↩ (June 5, 1979). We are cognizant of the fact that proposed regulations merely state respondent's position on a relevant issue and has no effect of law. However, we agree with respondent's position as set forth in the proposed regulation cited herein. 45. See discussion on pages 23-24. ↩
46. Sec. 731(a)(1) provides, in pertinent part, as follows: EXTENT OF RECOGNITION OF GAIN OR LOSS ON DISTRIBUTION. (a) PARTNERS. -- In the case of a distribution by a partnership to a partner -- (1) gain shall not be recognized to such partner, except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution * * * ↩
47. Sec. 44F↩ was added to the Code in 1981 by Pub. L. 97-34, sec. 221(a), 95 Stat. 241. It was later redesignated sec. 30 by Pub. L. 98-369, sec. 471(c), 98 Stat. 826, and later redesignated sec. 41 by Pub. L. 99-514, sec. 231(d)(2), 100 Stat. 2178. 48. In-House Research Expenses are defined in sec. 44F(b)(2)(A) as: (i) any wages paid or incurred to an employee for qualified services performed by such employee, (ii) any amount paid or incurred for supplies used in the conduct of qualified research, and (iii) any amount paid or incurred to another person for the right to use personal property in the conduct of qualified research. ↩
49. Sec. 44F(b)(2)(B) describes "qualified services" as follows: The term "qualified services" means services consisting of -- (i) engaging in qualified research, or (ii) engaging in the direct supervision of direct support of research activities which constitute qualified research. * * * ↩
50. For purposes of sec. 44F, the term "research or experimental" has generally the same meaning as used in sec. 174. See sec. 44F(d). Sec. 174↩ provides that research or experimental expenditures which are paid or incurred by a taxpayer in connection with his trade or business as expenses which are not chargeable to capital account shall be allowed as a deduction in the taxable year in which they are incurred. 51. Petitioner testified that his pro rata share of the costs for the working parts totaled $ 541.06, and his share of the patent attorney's expense for the 1982 taxable year totaled $ 300. ↩
52. We note that petitioner does not rely on sec. 174 for purpose of deducting the research expenses. For purposes of sec. 174, the Supreme Court, in Snow v. Commissioner,416 U.S. 500↩ (1974), relaxed somewhat the "active trade or business" requirement. 53. See note 44, supra.↩
54. Some of the canceled checks presented at trial by petitioner bore 1981 execution dates. ↩