MILTON T. RAYNOR AND MURIEL RAYNOR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

PETER DE MET AND LAURA DE MET, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3748-65, 5114-65. Filed August 26, 1968.

*Roger S. Baskes*, for the petitioners.
*Nelson E. Shafer*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes for 1961–63, inclusive, as follows:

| Year | Docket No. 3748-65 | Docket No. 5114-65 |
|------|--------------------|--------------------|
| 1961 | $12,933.66 | $224,956.60 |
| 1962 | 30,831.65 | 214,892.74 |
| 1963 | 43,105.57 | 220,721.93 |

Some of the items of the deficiencies have been settled by the parties. The issues remaining for decision are whether three corporations qualified as electing small business corporations under subchapter S of chapter 1 of the Internal Revenue Code of 1954, and, if so, the amount of corporate net operating losses deductible by petitioners under section 1374.[1]

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and exhibits thereto are incorporated herein by this reference.

Milton T. Raynor and Muriel Raynor, petitioners in docket No. 3748–65, are husband and wife whose residence was in California when their petition was filed. They filed joint Federal income tax returns for the years 1961–63, inclusive, with the district director of internal revenue, Chicago, Ill.

Peter De Met and Laura De Met, petitioners in docket No. 5114–65, are husband and wife whose residence was in Florida when their petition was filed. They filed joint Federal income tax returns for the years 1961–63, inclusive, with the district director of internal revenue, Chicago, Ill.

Muriel Raynor and Laura De Met are petitioners herein solely by reason of having filed joint returns with their husbands. Milton T. Raynor and Peter De Met will sometimes hereinafter be referred to as Raynor, and De Met or petitioners.

In the years 1956 through 1961, Harold Vineberg (hereinafter "Vineberg") of Miami Beach, Fla., and De Met organized five new bowling-alley ventures in the State of Florida: University Bowl, Inc. (hereinafter "University"); Coliseum Lanes, Inc. (hereinafter "Coliseum"); Lakeland Lanes, Inc. (hereinafter "Lakeland"); Sky Bowl, Inc. (hereinafter "Sky"); and Congress Lanes, Inc. (hereinafter "Congress"). Raynor invested in two of these, Lakeland and Sky, by the purchase in 1961 of stock from Stanley Peal.

Each of the five ventures was organized as a separate corporation. Each of the five corporations elected status under subchapter S of chapter 1 of the Internal Revenue Code.

University and Coliseum reported net income, and their status is not here challenged by the respondent. The other three corporations sustained net operating losses of which the distributive shares claimed by petitioners for the years 1961, 1962, and 1963 were as follows:

RAYNOR, DOCKET No. 3748–65

| | 1961 | 1962 | 1963 |
|---|---|---|---|
| Lakeland | $16,317.87 | $14,338.71 | $13,872.09 |
| Sky | 15,143.44 | 4,127.40 | 7,540.45 |
| | 31,461.31 | 18,466.11 | 21,412.54 |

DE MET, DOCKET No. 5114–65

| | 1961 | 1962 | 1963 |
|---|---|---|---|
| Lakeland | $38,073.71 | $33,457.00 | $13,872.09 |
| Sky | 35,334.68 | 9,630.60 | 7,540.45 |
| Congress | 42,394.61 | 21,155.41 | 30,270.80 |
| | 115,803.00 | 64,243.01 | 51,683.34 |

Lakeland, Sky, and Congress each filed information returns (Form 1120–S) on a calendar year basis for the years 1961, 1962, and 1963 with the district director of internal revenue, Jacksonville, Fla.

Under a written agreement dated March 21, 1961, Raynor sold 13⅓ percent of his stock in Lakeland and Sky to De Met for a total of $17,913.33. Under an agreement dated January 2, 1963, De Met sold the stock back to Raynor for the same price. The two shareholders' accountant in Chicago was advised of the sales and the shareholders' records and tax returns consistently reflected such sales.

Taking account of the sales, the proportionate shareholdings of Lakeland, Sky, and Congress were as follows:

LAKELAND

| | 4/18/60—1/3/61 | 1/3/61—3/21/61 | 3/21/61—1/1/63 | 1/2/63 and later |
|---|---|---|---|---|
| | | *Percent* | | |
| De Met | 33⅓ | 33⅓ | 46⅔ | 31⅔ |
| Vineberg | 33⅓ | 33⅓ | 33⅓ | 31⅔ |
| Peal | 33⅓ | | | |
| Raynor | | 33⅓ | 20 | 31⅔ |
| Wallace Tobias | | | | 5 |

| | SKY | | | CONGRESS |
|---|---|---|---|---|
| | Prior to 3/21/61 | 3/21/61—1/2/63 | On and after 1/2/63 | 1/1/61—12/31/63 |
| | | *Percent* | | |
| De Met | 33⅓ | 46⅔ | 31⅔ | 50 |
| Raynor | 33⅓ | 20 | 31⅔ | |
| Vineberg | 33⅓ | 33⅓ | 31⅔ | 50 |
| Wallace Tobias | | | 5 | |

In addition to capital contributions in exchange for stock, various additional amounts were advanced to each corporation and in each case credited to a single account on the books of each corporation entitled "Loans Payable to Shareholders." There was no corporate record of the source of credits made to the shareholders' loan account. The shareholders agreed among themselves that they were to be, in essence, "partners," and that they would share all of the burdens and benefits of ownership proportionately to their shareholdings. Their accountant sent the shareholders statements showing the advances made by each, and they adjusted their advances through transactions among themselves.

On or about June 27, 1961, Berlo Vending Co. of Philadelphia, Pa. (hereinafter "Berlo Vending"), lent the sum of $100,000 in exchange for a promissory note executed by Congress Bowl, Inc., Vineberg, and De Met. "Congress Bowl" has been used as a tradename for Congress Lanes, Inc., which was in fact the company executing the note. The $100,000 was paid to Congress and recorded in its "Loans Payable to Shareholders" account. Subsequently, Congress transferred $30,000 of

the loan proceeds to University and a total of $15,000 to Vineberg and De Met.

From 1961 through 1964, Berlo Vending reduced the $100,000 principal of the note by the amount of commissions earned by it from its food and beverage concessions at the Congress premises. Congress reduced correspondingly its balance due shareholders to reflect Berlo Vending's retention of Congress' funds.

All payments of principal and interest on the $100,000 loan were made by, and interest deductions were claimed by, Congress until 1965, after which payments in the total amount of $21,000 each were made by Vineberg and De Met.

In or about April or May 1961, Berlo Vending lent the sum of $35,000 in exchange for a promissory note executed by Sky, Vineberg, Raynor, and De Met. The $35,000 was paid to Sky and recorded in its "Loans Payable to Shareholders" account. All payments of principal and interest (and corresponding deductions therefor) on the loan and note have been made by Sky.

On or about January 13, 1961, Berlo Vending lent the sum of $50,000 in exchange for a promissory note executed by University, Coliseum, Lakeland, De Met, Vineberg, Peal, and Raynor. The $50,000 was paid to Coliseum; $16,666.66 of this amount was transferred by journal entries from Coliseum to Lakeland and also credited to the "Loans Payable to Shareholders" account of Lakeland. All payments of principal and interest (and corresponding deductions therefor) with respect to the share of the loan allocated to Lakeland have been made by Lakeland.

On or about August 3, 1962, and March 26, 1963, Central Bank & Trust Co. of Miami, Fla. (hereinafter "Central Bank"), lent the sums of $20,000 and $80,000, respectively, in exchange for promissory notes executed by Congress and guaranties executed by Vineberg, De Met, and Raynor. These amounts were paid to Congress and recorded on its books and records as "Loans Payable to Shareholders." All payments of principal and interest on the loans and notes have been made by Congress, and interest deductions were claimed by it.

On or about June 21, 1961, Central Small Business Investment Co. lent the sum of $60,000 in exchange for a loan agreement, corporate resolution, chattel mortgage, and promissory note by Lakeland, and a guaranty agreement by Raynor, Vineberg, and De Met. The transaction was subsequently reflected on Lakeland's "Loans Payable to Shareholders" account in the amount of $50,749.56.

All amounts advanced by Berlo Vending, Central Bank, and the Central Small Business Investment Co. were made for the use and benefit of Congress, Sky Bowl, and/or Lakeland rather than their

shareholders. The individuals (Vineberg, De Met, and Raynor) lent their names or credit ratings to secure the various loans.

Vineberg, De Met, and Raynor executed personal promissory notes to Brunswick Corp. in August 1963 in the amounts of $22,308 and $13,428, respectively. These amounts were due to Brunswick Corp. by Congress and Sky, respectively, which could not meet their cash requirements on such obligations. Brunswick accepted the aforesaid notes and assumption of liability in lieu of cash as additional security for amounts then due from the corporations on their obligations. The amounts were then transferred into the "Loans Payable to Shareholders" accounts of Congress, in the amount of $22,308 and of Sky, in the amount of $13,428.

On June 26, 1961, Vineberg, De Met, and Raynor borrowed the sum of $75,000 from Central Bank in exchange for a promissory note executed by them. They repaid amounts totaling $8,500 and advanced the balance of $66,500 to Congress. Subsequently, Congress transferred $66,833.33 (including the $66,500) to Sky, who recorded it on its "Loans Payable to Shareholders" account. Of that amount, $33,-333.33 was used as rent security; the balance was used as a downpayment to the Brunswick Corp. for equipment purchases. Congress paid $23,500 to Central Bank in 1962.

None of the amounts advanced by the shareholders to Congress, Sky, or Lakeland was evidenced by notes or other forms of indebtedness. There were no agreed maturity dates or demands for repayment, and none of the corporations made interest payments to any of the individuals. Some of the advances had to be made to start the businesses, and others had to be made to provide working capital to keep them operational until they went bankrupt. It was anticipated that the advances would be repaid, if at all, only if the corporations were successful. Moreover, none of the corporations could have obtained loans or financing from third parties under terms and conditions similar to those provided by shareholders.

According to the books of the corporations, the following table indicates the net balances in the "Loans Payable to Shareholders" accounts as of December 31, 1961–63:

| Corporation | 1961 | 1962 | 1963 |
|---|---|---|---|
| Congress | $135,137.68 | $110,566.00 | $167,641.64 |
| Sky | 74,687.78 | 67,113.17 | 93,037.84 |
| Lakeland | 70,758.44 | 121,508.00 | 204,408.42 |

The following tables indicate the deductible amounts of the net operating losses of Congress, Sky, and Lakeland for the years ending December 31, 1961–63:

| Year | Shareholders' basis in stock | Shareholders' basis in loans | Net operating loss | Deductible net operating loss |
|---|---|---|---|---|
| | *Congress* | | | |
| 1961 | $20,000 | $40,000.00 | $84,789.22 | $60,000.00 |
| 1962 | 0 | 0 | 42,310.83 | 0 |
| 1963 | 0 | 30,000.00 | 79,431.30 | 30,000.00 |
| | *Sky* | | | |
| 1961 | $30,000 | $71,006.34 | $75,717.18 | $75,717.18 |
| 1962 | 0 | [1] 1,789.16 | 20,637.01 | 1,789.16 |
| 1963 | 0 | 16,000.00 | 23,811.96 | 16,000.00 |
| | *Lakeland* | | | |
| 1961 | $43,350 | $13,693.78 | $81,587.36 | $57,043.78 |
| 1962 | 0 | 0 | 71,693.57 | 0 |
| 1963 | 0 | 0 | 43,806.62 | 0 |

[1] In 1962, Congress paid $23,500 to Central Bank which reduced the indebtedness of Raynor, De Met, and Vineberg on the $75,000 loan from Central Bank of June 26, 1961. This payment for the benefit of Sky reduced the shareholders' basis in amounts advanced to Sky.

## OPINION

Respondent determined in notices of deficiencies sent to petitioners that Congress Lanes, Inc. (Congress), Sky Bowl, Inc. (Sky), and Lakeland Lanes, Inc. (Lakeland), were not eligible for treatment as electing small business corporations under subchapter S of chapter 1 of the Internal Revenue Code of 1954, and, therefore, that petitioners were not entitled to deduct any part of the corporate net operating losses under section 1374. By amended answers, respondent pleaded alternatively that if any or all of the corporations qualified as electing small business corporations, then the claimed loss deductions are allowable only to the extent of the adjusted basis of petitioners' stock in the corporations and the adjusted basis of any indebtedness of the corporations to the petitioners as shareholders. As to the right of the three corporations to claim subchapter S status, petitioners have the burden of proof. As to the alternative proposition advanced in respondent's amended answer, the burden is on respondent. Rule 32, Tax Court Rules of Practice.

During the years 1956–61, Harold Vineberg organized five new bowling alley ventures along with petitioner De Met. Petitioner Raynor, who was De Met's attorney, persuaded De Met to allow him to invest in two of the corporations. During the years in issue, Vineberg and De Met were the sole shareholders of Congress, while Vineberg, De Met, Raynor, and, in 1963, Wallace Tobias were shareholders in Sky and Lakeland. Each of the three corporations owned and operated a bowling establishment, and each lost money which the shareholders

deducted on their personal Federal income tax returns pursuant to the provisions of section 1374.

Aside from initial stock purchases, each corporation was debt financed through a variety of arrangements described in detail in our findings. Each corporation established an account entitled "Loans Payable to Shareholders," and included therein funds advanced by the shareholders, and funds received from third parties for which the individuals were obligated. Moreover, these accounts reflected intercorporate transfers, since the shareholders on occasion had one corporation sign an obligation for the benefit of another corporation. Indeed, the "Loans Payable to Shareholders" accounts also included transactions by which no funds were actually advanced.

As to the funds actually advanced by the shareholders, no attempt was made by the corporations to identify which shareholder actually made the advance, and no debt instruments were drawn to evidence the individual lendings. None of the corporations made interest payments to any of the individuals.

Petitioners contend, and we have found, that the shareholders agreed among themselves that they were, in essence, acting as "partners." Specifically, they agreed that the amounts owed by each corporation were to be considered owed to the shareholders in proportion to their stockholdings, without regard to who in fact advanced the funds on open account. The taxpayers' accountant was to maintain records to reflect this arrangement, much like drawing accounts in a partnership, and the partners were to adjust their advances outside of the corporate framework. Of course, the result of this arrangement was to provide a totally confusing record, but we are still required to determine the substantive tax consequences without regard to the extra burden resulting therefrom.

The first question presented is whether the three corporations in fact qualify as subchapter S corporations. Respondent relies upon Code section 1371(a) (4), which provides that a corporation will be denied subchapter S status if it has "more than one class of stock." Prior to our decision in *W. C. Gamman*, 46 T.C. 1 (1966), appeal dismissed (C.A. 9, 1967), respondent took the position that if debt obligations of a corporation were found to represent risk capital, they would automatically constitute a "second class of stock," disqualifying the subchapter S election. However, in *Gamman*, we held that where shareholders' advances in the form of debt were in fact capital contributions, subchapter S status would not be lost if the advances were substantially proportionate to the nominal stock interests of the shareholders. Subsequent to our decision, the regulation was modified to incorporate this holding. Section 1.1371-1(g), Income Tax Regs., as revised Dec. 27, 1966, by T.D. 6904, 1967-1 C.B. 220, now provides:

Obligations which purport to represent debt but which actually represent equity capital will generally constitute a second class of stock. *However, if such purported debt obligations are owned solely by the owners of the nominal stock of the corporation in substantially the same proportion as they own such nominal stock, such purported debt obligations will be treated as contributions to capital rather than a second class of stock.* \* \* \* [Emphasis added.]

We have found that the shareholders intended that their advances were to be made in proportion to their stockholdings, regardless of who in fact loaned particular funds, and that reconciliation of the accounts be made by their accountant on this basis. We have also noted that the "Loans Payable to Shareholders" accounts did not reflect which shareholder made a particular loan. While such a procedure may well lead to confused or incomplete books, we do not think that it will, in and of itself, disqualify subchapter S elections. The result of the informal "partnership" arrangement was to make any "debt" of the corporations to the shareholders proportionate to the nominal stock interests. This is sufficient, under the language of the regulation and our decision in *Gamman*, whether the advances are regarded as loans or equity contributions, to prevent disqualification of the corporations under section 1371(a)(4).

Respondent contends that the advances to the corporations were not, in fact, substantially proportionate to the nominal stock interests. He notes that Vineberg, De Met, and Raynor borrowed $75,000 from Central Bank in 1961, and advanced $66,500 of the proceeds to Congress, in which Raynor was not a shareholder. But this argument ignores the fact that Congress then transferred this amount to Sky, which recorded the funds in its "Loans Payable to Shareholders" account. Raynor was a shareholder in Sky.

This is not a case where a subchapter S corporation has issued debt instruments to individual shareholders in amounts substantially disproportionate to their nominal stock interests, and the shareholders are attempting to persuade the Court that "things are not what they seem." The shareholder advances were on open account; no debt instruments were drawn. Nothing in the corporate records is inconsistent with the testimony of the shareholders that the advances were considered to be shared proportionately.

Respondent notes that the shareholders filed unequal claims in the bankruptcy proceedings against the corporations, and argues that the advances in fact gave the individuals preferences in liquidation. But this is by no means inconsistent with the "partnership" arrangement, for the uncontradicted testimony was that any proceeds from the claims would be shared by the stockholders in proportion to their stockholdings. The claims were based on the actual checks issued by each shareholder—the type of evidence needed in the bankruptcy

court to prove the claim—not on the operating agreement which is cognizable for Federal tax purposes.

Since we hold that the three corporations are entitled to subchapter S status, we must now determine the amount of the corporate net operating losses deductible by the petitioners. We have indicated in our findings the net balances in the "Loans Payable to Shareholders" accounts which may be traced to direct advances by the shareholders; the balance of the entries in each of these accounts represents loans from Berlo Vending, Central Small Business Investment Co., and Central Bank (in 1962 and 1963), or the execution of notes by the shareholders to the Brunswick Corp. as additional security for corporate debt, or unidentified entries which may or may not reflect actual advances of cash.

Respondent contends, and we agree, that the Berlo Vending notes and the Central Bank notes signed by one or more of the corporations and the individuals, as well as the Central Small Business Investment Co. note guaranteed by the individuals and the notes given to Brunswick as additional security, do not constitute "indebtedness of the corporation to the shareholder[s]" within the meaning of section 1374(c)(2)(B).[2] Accordingly, these liabilities may not be taken into account in computing the limitation on their shares of the corporate net operating losses.

Petitioners would have us view all of these transactions as if the sums advanced by Berlo Vending, Central Bank (in 1962 and 1963), Brunswick, and Central Small Business Investment Co. were first received by petitioners and then loaned to the three corporations with the result that the corporations were indebted to petitioners. This we cannot do.

Petitioners' argument is the same as that presented to the Court in *William H. Perry*, 47 T.C. 159 (1966), affd. 392 F. 2d 458 (C.A. 8, 1968), and *Joe E. Borg*, 50 T.C. 257 (1968). As was noted in *Borg*, the fact that shareholders may be primarily liable on indebtedness of a corporation to a third party does not mean that this indebtedness is "indebtedness of the corporation to the shareholder" within the meaning of section 1374(c)(2)(B). No form of indirect borrowing, be it

---

[2] SEC. 1374. CORPORATION NET OPERATING LOSS ALLOWED TO SHAREHOLDERS.

  (c) DETERMINATION OF SHAREHOLDER'S PORTION.—

    \*       \*       \*       \*       \*       \*       \*

    (2) LIMITATION.—A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of—

      \*       \*       \*       \*       \*       \*       \*

      (B) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation (or, if the shareholder is not a shareholder as of the close of such taxable year, as of the close of the last day in such taxable year on which the shareholder was a shareholder in the corporation).

guaranty, surety, accommodation, comaking or otherwise, gives rise to indebtedness from the corporation to the shareholders until and unless the shareholders pay part or all of the obligation. Prior to that crucial act, "liability" may exist, but not debt to the shareholders. See *Gilman* v. *Commissioner*, 53 F. 2d 47, 50 (C.A. 8, 1931) ; *Joe E. Borg, supra,* and cases cited therein.

Nor may the notes executed in 1963 by the shareholders in favor of Brunswick be considered as payment by the shareholders so as to give rise to indebtedness of the corporations. They were simply additional security for the preexisting obligations of Congress and Sky. The notes were not due until 1964, and any payments made by the corporations would, pro tanto, discharge the obligation of the individuals. *If and when* the individuals actually paid Brunswick (which did not occur in the years before us), indebtedness of the corporations to the shareholders would arise.

We hold, therefore, that only those amounts in the "Loans Payable to Shareholders" accounts traceable to direct lendings by the individuals (as noted in our findings) constitute "indebtedness of the corporation[s] to the shareholder[s]" for the purpose of computing the limitation on the shareholders' portions of the corporate net operating losses. In order to reflect concessions made by the parties, and compute adjustments to the claimed net operating loss deductions occasioned by our decision and by stock transfers during the years in issue,

*Decisions will be entered under Rule 50.*