WILLIAM T. ELLIS AND WILMA O. ELLIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ellis v. Commissioner
Docket No. 44233-86.
United States Tax Court
T.C. Memo 1989-280; 1989 Tax Ct. Memo LEXIS 280; 57 T.C.M. (CCH) 677; T.C.M. (RIA) 89280; June 8, 1989. James M. Sturgeon, Jr., for the petitioners. Andrew M. Winkler, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioners' Federal income taxes in the amounts and for the taxable years as follows: Taxable Year
Deficiency
1978
$    368.00
1979
698.00
1980
5,519.00
1982
103,735.00
1983
10,480.48
As a result *282 of concessions, [1] the sole issue is to what extent, for taxable years 1982 and 1983, petitioner Wilma O. Ellis is entitled to deduct her share of the net operating losses sustained by Triad Distributors, Inc., an electing small business corporation. *283 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulated facts and attached exhibits are incorporated as our findings by this reference. Petitioners William T. Ellis (Mr. Ellis) and Wilma O. Ellis (Mrs. Ellis) resided in Charleston, West Virginia, when their petition was filed. Petitioners filed joint Federal income tax returns for the years at issue. Triad Distributors, Inc. (Triad) was incorporated as a West Virginia corporation and filed an election with the Internal Revenue Service in 1981 to be treated as a small business corporation under section 1372. [2] From the date of incorporation, Mrs. Ellis and J. Robert Rogers (Mr. Rogers) each owned one-half of the common stock of Triad. None of the shares of stock of Triad were owned by Mr. Ellis. Triad was originally capitalized with a total of $ 50,000 received from Mrs. Ellis and Mr. Rogers in exchange for the common stock of Triad. Triad was formed for the purpose of engaging in the wine wholesale business. *284 During 1982, Charleston National Bank (CNB) and Bank of Danville made loans to Triad. As security for these loans, CNB held a purchase money lien on Triad's entire inventory, which consisted of wine purchased for resale, and the Bank of Danville held a lien on the other, unidentified assets of Triad. As additional security, CNB and Bank of Danville each requested that petitioners and Mr. Rogers become guarantors for these loans. Triad borrowed in excess of $ 200,000 from each bank. The face amount of Triad's debt obligations to CNB totaled $ 249,552.50. These debts were represented by six 90-day notes of various amounts (the 90-day notes). By August 1982, Triad was delinquent in the payment of several of the 90-day notes and was unable to finance its continued operations. Consequently, in August of 1982, CNB repossessed and liquidated, with petitioners' and Mr. Roger's cooperation, the wine inventory of Triad. Triad never resumed active business operations after the repossession and liquidation of its wine inventory. The liquidation proceeds were applied to pay down the 90-day notes but were insufficient to satisfy those notes. By letter dated September 14, 1982, CNB *285 notified petitioners and Mr. Rogers that CNB was looking to each of them, as guarantors, to make suitable arrangements to satisfy or provide additional security for the 90-day notes. Their failure to do so would leave CNB with no alternative but to exercise its rights under the guarantees and pursue petitioners and Mr. Rogers individually for payment. At this time, Triad was insolvent. Triad's financial statement dated June 6, 1983, showed a negative net worth as of December 31, 1982, of $ 526,400.26. By November of 1982, petitioners reached an oral understanding with Mr. Rogers which, in essence, provided that petitioners would arrange to satisfy the 90-day notes with a new note in which petitioners would provide additional security and assume sole liability. Also, the parties agreed that Mr. Rogers would arrange to satisfy Triad's debt obligation to the Bank of Danville. The obligations to both banks were approximately of equal amounts. Pursuant to this understanding, petitioners negotiated with CNB for the execution of a new note in place of the 90-day notes with enough security so that Mr. Rogers would not be required to be a party to this note. Thereafter, on November 20, 1982, a *286 new note (consolidation note) in the face amount of $ 261,838.58 was executed by Triad and petitioners. The consolidation note encompassed the outstanding balance Triad was obligated to pay under the 90-day notes ($ 211,838.58), and an additional $ 50,000 previously borrowed from CNB. Mr. Ellis and Mr. Rogers had previously co-signed a note borrowing $ 50,000 from CNB. The $ 50,000 loan proceeds from this loan were utilized in connection with the operation of Triad. The consolidation note was secured with an assignment from Jamon Real Estate Corporation (Jamon) of some of its assets. Jamon is a corporation of which Mr. Ellis owns 75 percent of its stock. Mrs. Ellis is not a shareholder in Jamon. Mrs. Ellis held the corporate office of secretary of Triad on November 20, 1982, when she signed the consolidation note individually and as secretary of Triad. Triad's board of directors had previously adopted at least three corporate resolutions that authorized Mrs. Ellis to act on behalf of Triad with CNB "in all matters and transactions relating to any of its business with said Bank." Each of these resolutions provided that Mrs. Ellis' authority "shall continue without limitation *287 until a certified copy of a resolution of [Triad's] board revoking said authority is filed with [CNB]." The consolidation note to CNB, with "Triad Distributors, Inc." and "Sec." typewritten and the remainder consisting of signatures, was executed as follows: Triad Distributors, Inc. /s/ W. T. Ellis /s/ Wilma Ellis, Sec.
/s/ W. T. Ellis /s/ Wilma O. Ellis After the execution of the consolidation note on November 20, 1982, payments were not to be made on the consolidation note until 1983. In 1983 and thereafter, Triad never made any payments to CNB on the consolidation note. All payments have been made by petitioners. However, the record in this case does not reveal who, between the petitioners, made payments to CNB, what amounts were paid to CNB, and when payments were made on the consolidation note. The Internal Revenue Service began its examination of petitioners' 1978 through 1983 Federal income tax returns on May 2, 1984. Petitioners were issued a notice of deficiency on April 2, 1985. Approximately seven months later, on September 30, 1985, petitioners filed a complaint in a West Virginia state court requesting an order removing Triad from the consolidation *288 note effective November 20, 1982, the date the consolidation note was executed. The complaint alleged that Triad was not a party to the consolidation note because, inter alia, Mrs. Ellis did not have authority to obligate Triad on the consolidation note, and because Triad was not intended to be a party to the consolidation note. In answering petitioners' complaint, CNB responded by stating that it intended that petitioners would be "primarily" responsible for the payments due under the consolidation note. CNB further stated that it "had no anticipation that any part of said obligation would be paid by or that it would take any action to recover any part of said obligation from Triad Distributors, Inc." On February 10, 1986, the West Virginia state court in response to a motion for summary judgment by petitioners granted summary judgment and ordered that Triad was never liable on the consolidation note. For taxable years 1981, 1982, and 1983, Triad sustained net operating losses in the respective amounts of $ 162,951, $ 508,244 and $ 107,607. Mrs. Ellis' claimed deductions for her pro rata portion of the net operating losses of Triad, the amounts of such losses disallowed by *289 respondent, and the amounts allowed by respondent are as follows: 1982
1983
Claimed
$ 219,387
$ 37,768
Allowed
346
1,014
Disallowed
$ 219,041
$ 36,754
OPINION Sections 1374(a) and (b) provided prior to 1983 and sections 1366(a) and (d) provided after 1982 that a shareholder of an electing small business corporation may deduct his pro rata share of that corporation's net operating loss. [3]Section 1374(c)(2) (and section 1366(d)(1) after 1982) limited such a deduction to the sum of (A) the adjusted basis of the shareholder's stock in the corporation (section 1374(c)(2)(A) limitation) and (B) the adjusted basis of "any indebtedness of the corporation to the shareholder" (section 1374(c)(2)(B) limitation). *290 Petitioners' first contention is that the consolidation note represents, in substance, a loan from CNB to petitioners followed by a capital contribution to Triad increasing Mrs. Ellis' adjusted basis in her Triad stock. [4] This, petitioners assert, increased Mrs. Ellis' section 1374(c)(2)(A) limitation. Accordingly, under this theory petitioners argue that their deductible losses from Triad are limited to Mrs. Ellis' adjusted basis in her Triad stock which basis includes a deemed capital contribution of the $ 261,838.58 due under the consolidation note. *291 This Court has recently considered and rejected the argument that a guarantee of an electing small business corporation's debt by a shareholder could increase the amount of a shareholder's section 1374(c)(2)(A) limitation. Estate of Leavitt v. Commissioner,90 T.C. 206 (1988), affd.   F.2d    (4th Cir., May 19, 1989). [5] In that case, we held that a shareholder's guarantee of a third-party loan to a Subchapter S corporation may not be treated, in substance, as an equity investment in the corporation absent an economic outlay by the shareholder guarantor. Estate of Leavitt v. Commissioner, supra at 216. The economic outlay generally contemplated by this Court, in the case of a shareholder's guarantee of an obligation of a corporation is the payment by the shareholder guarantor of the underlying obligation guaranteed by the shareholder. Estate of Leavitt v. Commissioner,90 T.C. at 217; Perry v. Commissioner,54 T.C. 1293, 1296 (1970), affd. 71-2 USTC par. 9502, 27 AFTR2d 71-1464 (8th Cir. 1971); *292 Raynor v. Commissioner,50 T.C. 762, 770-771 (1968). Accordingly, petitioners clearly did not increase their section 1374(c)(2)(A) limitation by merely guaranteeing the 90-day notes. With respect to the $ 50,000 borrowed by Mr. Ellis and Mr. Rogers, and contributed to Triad, petitioners have not argued, and we do not consider, whether any part of this contribution represents a capital contribution by Mrs. Ellis, Mr. Ellis and/or Mr. Rogers. With respect to petitioners' execution of the consolidation note, this is not a case where petitioners are arguing that they had made an additional capital contribution to Triad increasing their section 1374(c)(2)(A) limitation. Petitioners only assumed a pre-existing obligation by executing the consolidation note. Accordingly, petitioners have not increased their section 1374(c)(2)(A) limitation by the amount of the consolidation note. Petitioners' second argument and the one advanced at trial is that Mrs. Ellis became subrogated to the rights of CNB under the 90-day notes upon the execution of the consolidation note. Petitioners assert that, when *293 this purported subrogation occurred, the amount of the consolidation note became an "indebtedness of the corporation to the shareholder" under section 1374(c)(2)(B) (section 1366(d)(1)(B) for 1983). This theory is premised on their assertion that Triad was not a party to this note. In Raynor v. Commissioner,50 T.C. at 770-771 (1968), we held that "no form of indirect borrowing, be it * * * comaking * * * gives rise to indebtedness from the corporation to the shareholders until and unless the shareholders pay part or all of the obligation." For purposes of our discussion, we will assume, without deciding, that petitioners' reformation of the consolidation note deleting Triad as a party to the note was effective for Federal tax purposes. See Commissioner v. Estate of Bosch,387 U.S. 456 (1967); Gordon v. Commissioner,70 T.C. 525 (1978). [6] We will determine whether petitioners' substituted consolidation note represents an indebtedness of Triad to Mrs. Ellis within the meaning of section 1374(c)(2)(B). *294 The facts of this case are similar in material respects to those in Underwood v. Commissioner,63 T.C. 468 (1975), affd. 535 F.2d 309 (5th Cir. 1976). In Underwood, two corporations, Underwood's of Lubbock, Inc. and Underwood's of Albuquerque, Inc., were controlled by a taxpayer. The net operating losses of Underwood's of Albuquerque, Inc. exceeded the taxpayer's basis in that corporation stock. Underwood's of Albuquerque, Inc. had received loans from Underwood's of Lubbock, Inc. in prior years. To attempt to increase his share of net operating loss from Underwood's of Albuquerque, Inc., the taxpayer had cancelled the debt Underwood's of Albuquerque, Inc. owed Underwood's of Lubbock, Inc., and the taxpayer gave his note in place of this cancelled indebtedness. In Underwood, we held that the new notes merely shifted the liabilities for the prior loans and were similiar in Federal tax effect to a guarantee of the indebtedness of a subchapter S corporation. Underwood v. Commissioner,63 T.C. at 475. "Only after the guarantor or *295 surety performs on his contract of guaranty does the debtor's liability to the creditor become an indebtedness to the guarantor." Underwood v. Commissioner, supra at 476. "[I]t is the payment by the guarantor of the guaranteed obligation that gives rise to indebtedness on the part of the debtor to the guarantor." Underwood v. Commissioner, supra at 476 (emphasis added). In this case, no evidence was presented to establish what payments were made to CNB to satisfy either the 90-day notes or the consolidation notes. Petitioners had ample opportunity to present corroborating evidence as to what payments were made on these notes, who made these payments and when these payments were made. Petitioners' self-serving declaration at trial that payments were made on the 90-day notes and the consolidation notes does not carry their burden of proof that they be allowed to increase their loss limitations to an amount greater than that allowed by respondent. Petitioners' alternative subrogation theory is based on their contention that they performed their guaranty obligation when they executed the consolidation note creating an indebtedness from Triad *296 to Mrs. Ellis. Having found that subrogation did not occur when the consolidation note was executed, we hold that the consolidation note does not represent an indebtedness of Triad to Mrs. Ellis. Having so held, we do not consider other arguments raised by respondent. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Respondent has conceded that there are no deficiencies in income taxes due from petitioners for 1978 and 1979. The parties agree that the deficiency in income tax for 1980 is $ 4,706. Petitioners concede that the deficiency for 1982 resulting from recomputing the prior year investment tax credit is $ 5,568 as determined in respondent's notice of deficiency. The alternative minimum tax for 1983 will be a matter for computation once the issue in this case is resolved. Respondent determined that petitioners had additional unreported dividend income in 1982 and 1983 in the amounts of $ 150,085 and $ 15,648, respectively. The parties now agree that the correct amounts of additional unreported dividend income for these years are $ 50,695 and $ 8,224, respectively. Petitioners' reported dividend exclusions for 1982 and 1983 are increased by the amounts of $ 189 and $ 136, respectively. Petitioners' commission income for 1982 is $ 94,368. Petitioners' allowable deductions for general sales tax, as calculated from the appropriate sales tax tables, are dependent upon their adjusted gross income for each year in issue. The adjusted bases of Mrs. Ellis' Triad stock (determined without regard to any adjustment under section 1376 for the appropriate taxable year), determined as of the close of the taxable year of Triad for 1981 and 1982 were $ 21,691 and $ 346, respectively. The adjusted basis of Mrs. Ellis' stock in Triad (determined with regard to paragraph (1) of subsection 1367(a)) for 1983 was zero. Petitioners concede the disallowance of $ 53,309 of the $ 75,000 claimed deduction for Mrs. Ellis' claimed pro rata portion of the net operating loss of Triad for 1981.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Section 1374 and the other provisions relating to electing small business corporations have been substantially amended and renumbered effective subsequent to the years in issue other than 1983, by, inter alia, the Subchapter S Revision Act of 1982, Pub. L. 97-354, 95 Stat. 1669. The provisions of former section 1374 are found in section 1366(d)↩ for petitioners' 1983 taxable year. These amendments, however, have no effect on the disposition of this case.
4. Petitioners advance the argument in their briefs that the consolidation note represents, in substance, a contribution to the capital of Triad. However, at trial, petitioners represented to the Court that they were not arguing that the consolidation note represented a capital contribution. Although, we will address this issue, we find that the record poorly reflects what capital contributions were actually made to Triad and who made those capital contributions. Specifically, the record does not reveal whether the $ 50,000 contributed by Mrs. Ellis and Mr. Rogers at the incorporation of Triad represent the same $ 50,000 represented by the note cosigned by Mr. Ellis and Mr. Rogers which became incorporated into the consolidation note.↩
5. See Fear v. Commissioner,T.C. Memo. 1989-211↩.
6. Under the rationale of these cases, the nonadversarial litigation in the state court referred to herein would have no effect on the Federal income tax considerations of this case.↩