MICHAEL L. ALLEN AND ANN MARIE ALLEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Allen v. Commissioner
Docket No. 5567-91
United States Tax Court
T.C. Memo 1993-612; 1993 Tax Ct. Memo LEXIS 634; 66 T.C.M. (CCH) 1690; December 22, 1993, Filed *634 For petitioners: Thomas C. Morrison. For respondent: Thomas E. Ritter. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, by means of a statutory notice of deficiency, determined deficiencies in petitioners' Federal income tax for taxable years 1980, 1981, and 1983 in the amounts of $ 7,320.96, $ 157,601.08, and $ 6,535.80, respectively. After concessions, the issues for our consideration are: (1) Petitioner husband's adjusted basis in the stock and notes of his solely owned S corporation for purposes of computing his allowable loss for the 1980 tax year; and (2) whether petitioner husband received a constructive distribution of the S corporation's assets and, if so, the tax consequences of the distribution. FINDINGS OF FACT Some of the facts have been stipulated and the stipulation of facts and attached exhibits are incorporated by this reference. At the time of the filing of the petition herein, petitioners were married and resided in Columbia Falls, Montana. Petitioners filed joint Federal income tax returns for taxable years 1980, 1981, 1982, and 1983. Petitioners filed amended joint tax returns for taxable years 1982 and 1983. References *635 to petitioner in the singular are to Michael L. Allen. Beginning in August 1968, and through the years in issue, petitioner was a full-time dentist practicing in Columbia Falls, Montana, and surrounding areas. In 1977, petitioner learned, through friends in Columbia Falls and a banker in Libby, Montana, of property in Libby that was for sale. The property, known as the Venture Inn, operated as a motel, bar, and restaurant. Petitioners traveled approximately 118 miles to Libby to view the property. Petitioner decided to purchase the Venture Inn mainly because he believed that, when the Federal Government's planned dam re-regulation project was initiated in the nearby area, there would be an increased demand for motel accommodations over the next 5 to 7 years. On April 9, 1977, an Agreement To Buy And Sell was executed between petitioner and the sellers, Robert P. Chapman and Patricia J. Chapman (the Chapmans). On April 21, 1977, petitioner formed a corporation called The Venture Inn (TVI), which remained inactive until January 1, 1978. On April 27, 1977, petitioner purchased the Venture Inn from the Chapmans for $ 1,250,000. A downpayment of $ 250,000 was due immediately, *636 with the balance deferred in connection with a Contract for Deed. When he purchased the Venture Inn, petitioner envisioned expanding the facility to meet the anticipated demand for rooms. To facilitate his construction financing, petitioner, in negotiating the purchase, required the Chapmans to subordinate their deferred purchase-money rights. Petitioner paid the $ 250,000 downpayment in cash comprised of $ 60,000 of personal funds, a $ 90,000 bank loan, and $ 100,000 borrowed from three of petitioner's friends. On May 3, 1977, the Contract for Deed was recorded through a Notice of Purchaser's Interest, which effectively made TVI the record owner of petitioner's rights under the Contract for Deed. TVI filed an election to be treated as an S corporation, effective as of January 1, 1978. Also on that date, petitioner contributed the Venture Inn to TVI in a section 351 [1] exchange and TVI began operating. Up until this time, petitioner had operated the Venture Inn as a sole proprietorship and reported a loss on his Form 1040 Schedule C for taxable year 1977. Petitioner was at all times the sole shareholder of TVI, which, following petitioner's contribution, was in turn the owner *637 of the Venture Inn. TVI remained an S corporation throughout the years under consideration. TVI filed Small Business Corporation Income Tax Returns, Forms 1120S, for taxable years 1980, 1981, and 1982. On October 17, 1978, petitioners acquired an unimproved lot (hereinafter sometimes referred to as parcel B) from Hugh G. and Alice I. Cumming for $ 30,000. Parcel B adjoins the Venture Inn and was acquired so that the motel could be expanded on its existing site. Petitioners did not transfer ownership of parcel B to TVI. Petitioner believed that retaining direct ownership afforded him a strong negotiating position in the event that the investment proved unsuccessful and the Chapmans attempted to foreclose on the corporate property. To effectuate their expansion plans, on or about August 1, 1979, petitioners and TVI *638 obtained a $ 350,000 loan through a Mortgage Participation Agreement. The loan was secured through the U.S. Small Business Administration (SBA) and the Bank of Columbia Falls, Montana. In addition to the mortgage executed by TVI and petitioners, petitioners were required to pledge as collateral two other parcels of their land. Petitioners never paid on the SBA construction loan. In addition to the SBA construction loan, TVI borrowed money from the First National Bank of Libby, Montana, which was secured by a mortgage on TVI's inventory and equipment. TVI also borrowed funds from petitioner. After obtaining the financing, a twenty-one room addition was constructed. Sometime after the commencement of the expansion, petitioner discovered that the Federal Government had abandoned its plans for the dam re-regulation project in northwest Montana. As a result of the discontinuation of the Government's project (which was to have brought tourism to the area), the SBA, on August 7, 1980, made an economic dislocation loan of $ 75,000 to assist TVI. Paul Jackson (Jackson), one of petitioner's patients, managed motel properties and was involved in putting together exchange transactions. *639 Because of difficulties in managing the motel and cash-flow problems which worsened (due in part to the increase in interest rates on the SBA loan), petitioner contacted Jackson. Among other business ventures, Jackson was involved in the operation of motel properties in the southeastern United States. Jackson's business in Montana was conducted under the name of Imperial Motel Associates, a sole proprietorship which he operated. Petitioner's initial purpose in contacting Jackson was to see if he would take over the management of the Venture Inn. However, during their first meeting Jackson proposed a like-kind exchange, and petitioner agreed. On September 15, 1980, petitioner paid Jackson $ 75,000 by check which was deposited into the account of Jackson Farms, an account Jackson maintained in Great Falls, Montana. On October 1, 1980, TVI and petitioner entered into a Real Estate Exchange Agreement which contemplated a-"Starker" like-kind exchange [2] between TVI, petitioner and Jackson. Under the terms of the exchange agreement, TVI and petitioner were to sell, transfer, or exchange the Venture Inn and parcel B (the motel properties) for an agreed value of $ 1,900,000 together *640 with $ 75,000 in cash, subject to encumbrances totaling $ 1,413,000, in exchange for Jackson's acquiring and conveying to petitioners certain farm property in Garfield County, Montana, for a value of $ 1,340,000 together with storage bins constructed for $ 75,000. To qualify the transaction as a "Starker" like-kind exchange, Jackson was to locate a purchaser for the motel properties within 2 years whereby the debt assumption by the Venture Inn and petitioners equaled the debt relief. Under the terms of the agreement, petitioner had the right after 1 year to call in the $ 75,000 advanced cash payment plus annual interest of 12 percent. The agreement also provided that, commencing October 1, 1980, Jackson was to assume the cash-flow benefits and burdens *641 of operating the Venture Inn. Also on October 1, 1980, in furtherance and support of the Real Estate Exchange Agreement, several other documents were executed by and between the parties, including: Notices of Exchange Interest in Real Estate, Quitclaim Deeds, Bills of Sale, and Warranty Deeds. Attorney John Lence (Lence) held all bills of sale and deeds related to the exchange agreement and related transactions (discussed infra) as an escrow agent. Jackson, however, was unable to deliver title on the farm property originally contemplated in the exchange agreement. On December 2, 1980, TVI, petitioner and Jackson entered into a lease agreement made retroactive as of October 1, 1980, through and including November 15, 1981, whereby Jackson d/b/a Imperial Motel Associates, leased the Venture Inn from TVI and petitioner. The lease was prepared by Lence at the request of petitioner and Jackson. The lease was a triple-net lease such that no cash rental was called for, however, Jackson was responsible for all payments on all outstanding loans on the property as well as all other costs and expenses of operation, including taxes, fees, and other charges of any kind. In addition, *642 Jackson was required to maintain indemnity and casualty insurance on the property. On November 15, 1981, the day the lease was to expire, petitioner, as president of TVI, executed and delivered to Lence a Warranty Deed and Bill of Sale for the purpose of conveying the Venture Inn and its related chattels to Jackson. On the same day, Berja Investments (a general partnership consisting of Jackson and Joseph T. Berlin) executed and delivered to petitioner a Warranty Deed to property in Bozeman, Montana, (hereinafter referred to as the Norem Building) which it had acquired 3 months earlier on August 14, 1981, from Gilbert T. Rodriguez. The transfer of the Norem Building to petitioner was subject to a lease with Don Norem Chevrolet/Buick, Inc., and total assumed encumbrances of $ 662,031.96. [3] Jackson also gave petitioner a signed promissory note in the amount of $ 78,000 together with an Agreement Regarding Collateral on that date. The Agreement Regarding Collateral describes the transaction as an exchange of the Venture Inn and parcel B for the Norem Building. Under the terms of the agreement, parcel B was to remain in petitioners' name until Jackson delivered to petitioner a release *643 on the underlying indebtedness of the Venture Inn and evidence that the promissory note had been paid in full. Neither petitioners nor Jackson signed the Agreement Regarding Collateral. On December 10, 1981, a preliminary title insurance report was issued to Jackson, as a prospective buyer of the Venture Inn, proposing to insure the motel and parcel B, although no title insurance policy was ever issued. On the same day, Jackson entered into a Real Estate Sales Agreement with Henry J. Ostle, Mildred B. Ostle, and Percy Ostle (the Ostles). The agreement stated that Jackson, as owner of the Venture Inn, sold a 50-percent interest in the Venture Inn to the Ostles for a sales price computed as 50 *644 percent of $ 1,800,000 allocated between downpayment and assumption of liabilities in the respective amounts of $ 400,000 and $ 1,400,000. In accordance with their 50-percent interest, the Ostles made a downpayment of $ 200,000 and assumed 50 percent of the approximately $ 1,400,000 of existing encumbrances. Concurrent with these agreements, Grant Deeds were executed by Jackson giving Henry J. and Mildred B. Ostle a 37.5-percent interest and Percy Ostle a 12.5-percent interest in the Venture Inn and parcel B. In accordance with the sales agreement, a lease agreement was simultaneously entered into by which Jackson leased back the Ostles' 50-percent interest for a period of 5 years for a yearly rental of $ 24,000, payable semi-annually, payment of all existing and future debt service on the property, and payment of all costs and operating expenses. On January 20, 1982, Berja Investments and Bear Country Corp. [4] entered into an exchange agreement with Harvey J. Parmelee (Parmelee). Under the agreement, in consideration of a $ 50,000 payment by Parmelee, Berja's 28.32-percent interest in a motel in Iowa and Bear Country's 50-percent interest in the Venture Inn were exchanged for *645 farm and ranchlands in Pondera County, Montana. There is indication that this agreement was implemented. On January 25, 1982, Jackson executed a Grant Deed and Bill of Sale in favor of Parmelee transferring to him a one-eighth interest in the Venture Inn property, parcel B, and the personal property of the Venture Inn. On February 26, 1982, Jackson filed a petition for protection under chapter 11 of the Bankruptcy Code. Jackson listed all the debts due by the Venture Inn as his own on the bankruptcy petition. He also listed a three-eighths ownership interest in the Venture Inn as his asset. On March 30, 1982, Lence, as escrow agent, released all *646 bills of sale and deeds related to the exchange agreement and related transactions and they were recorded. [5]
On May 26, 1982, the Chapmans and Jackson entered into a contract whereby the Chapmans agreed to purchase all real and personal property of the Venture Inn. Under the terms of the contract the Chapmans were to pay $ 100,000 at closing and to assume the underlying debt as follows: Chapman contract for deed
$ 521,660.00
Sea-1st Mortgage
401,504.00
Cumming's contract for deed
26,111.55
Liquor license-SBA security agreement
37,000.00
Real estate taxes
58,000.00
SBA improvement loan
350,000.00
SBA direct loan
75,000.00
The contract states that the "Closing to be upon approval by Federal Bankruptcy Judge in Seller's Chapter 11 Reorganization." In addition, among other things, Jackson, *647 as seller, was to secure a release from petitioner of his $ 78,000 equity claim and note, and a full release of the Ostle and Parmelee interests. From August 16, 1982, through August 30, 1982, various documents were executed unraveling the various transactions regarding the Venture Inn, resulting in the completed transfer of the Venture Inn back to the Chapmans. The transactions between Jackson and the Chapmans did not disturb petitioner's interest in the Norem Building. Petitioner retained his interest in the Norem Building until 1986 at which time, following 2 years of negotiations, he sold it to Don and Katherine Norem for $ 790,000. As of December 31, 1979, petitioner's basis in his TVI stock was $ 22,424.25. Petitioners requested an extension of time to file their 1980 individual return. Petitioners explained the need for an extension as follows: "Taxpayer was engaged in a motel business that was exchanged pursuant to Section 1031 of the Internal Revenue Code. Additional time is needed to properly reflect deferred gain and carry over basis." Respondent granted petitioners an extension to October 15, 1981. On Schedule E of their 1980 return, filed October 13, 1981, petitioners *648 carried over TVI's 1980 reported loss of $ 74,520. When TVI filed its 1981 Small Business Corporation Income Tax Return on October 19, 1982, it reported a taxable loss of $ 304,751. TVI's 1981 return reflects November 1, 1981, as the date of disposition of all its assets. For taxable year 1981, petitioners again requested and were granted an extension of time to file their return. Petitioners' explanation for this request was as follows: "Taxpayers were involved in a Section 1031 Tax-Free Exchange and additional time is necessary [for] * * * computing basis on acquired property." On that return petitioners' Schedule E reflects November 1, 1981, as the acquisition date of the Norem Building. [6] Due to basis limitations, as computed by petitioners, their 1981 return reflected $ 103,464 of TVI's reported loss. For taxable year 1981, TVI reported a complete disposition of its assets. For 1982, *649 TVI filed an inconsistent corporate return reflecting a taxable loss of $ 124,877 in connection with the disposition of its assets. The difference in the losses claimed on the corporate returns for 1982 and 1981 is attributable to additional claimed depreciation on equipment and paving. The corporate return for taxable year 1982 states that the return for 1981 is to be amended; however, no amended return was ever filed. Under the basis limitations as computed by petitioners, they brought forward a $ 469 loss on their 1982 individual return. OPINION For convenience, we will summarize the relevant facts. Petitioner purchased the Venture Inn in 1977 and transferred it to TVI, a wholly owned S corporation, in 1978. Petitioner deducted losses relating to TVI for the years he claimed it owned the Venture Inn. Petitioner experienced financial difficulties with respect to TVI and, in 1980, contracted with Jackson to exchange the Venture Inn for other property in a section 1031 tax-free transaction. Jackson encountered difficulties in locating and acquiring property suitable to execute the exchange. While Jackson was looking for property, he took over management of the Venture Inn. *650 On November 15, 1981, petitioner and Jackson executed and delivered documents conveying the Venture Inn to Jackson and the Norem Building to petitioner. After that date, petitioner exercised ownership over the Norem Building and Jackson exercised ownership over the Venture Inn. Jackson even transferred a portion of ownership in the Venture Inn to third parties. In 1982, under threat of repossession, Jackson transferred the Venture Inn back to the owners from whom petitioner had originally purchased it. Petitioner's Basis and Loss Limitation for 1980
As a general rule, section 1374(a) provides that the net operating loss of an S corporation passes through to its shareholders. However, section 1374(c)(2) [7] limits each shareholder's portion of the S corporation's net operating loss to the sum of the adjusted basis of the shareholder's stock and the adjusted basis of any indebtedness of the corporation to the shareholder. *651 The parties are in agreement that as of December 31, 1979, petitioner's adjusted basis in his TVI Stock was $ 22,424.25. It is from this date forward that the parties diverge. Respondent determined that TVI's records reflected an increase in notes payable to petitioner from the taxable year ending December 31, 1979, to the taxable year ending December 31, 1980, in the amount of $ 8,784. Respondent determined that, as of December 31, 1980, petitioner's adjusted basis in his TVI stock was $ 31,208 by adding the increase in notes to petitioner's adjusted basis. Accordingly, of the $ 74,520 loss claimed on their 1980 joint return, respondent disallowed $ 43,312 (total loss claimed of $ 74,520 - adjusted basis of $ 31,208 - $ 43,312). Petitioner bears the burden of proof that respondent's determination is in error. Rule 142(a). Petitioners contend that as a result of their coparticipation in the $ 350,000 SBA loan, which they were required to collateralize with personal assets, petitioner is entitled to a stepup in basis for purposes of determining passthrough losses. Petitioner would have us view the transaction as one in which he, with his wife, borrowed $ 350,000 from the SBA *652 and then constructively loaned the full amount to TVI. Petitioners' argument is neither novel [8] nor persuasive. This Court in Estate of Leavitt v. Commissioner, 90 T.C. 206, 211 (1988), affd. 875 F.2d 420 (4th Cir. 1989) restated our holding in Raynor v. Commissioner, 50 T.C. 762, 770-771 (1968) that: the fact that shareholders may be primarily liable on indebtedness of a corporation to a third party does not mean that this indebtedness is "indebtedness of the corporation to the shareholder" within the meaning of section 1374(c)(2)(B). No form of indirect borrowing, be it guaranty, surety, accommodation, comaking or otherwise, gives rise to indebtedness from the corporation to the shareholders until and unless the shareholders pay part or all of the obligation. Prior to that crucial act, "liability" may exist, but not debt to the shareholders. [Citations omitted.]
*653 Petitioner testified that he did not personally pay any amount on the SBA loan. In the absence of that "crucial act" no indebtedness of the corporation to him as a shareholder exists. Accordingly, petitioner is not entitled to an increase in basis in connection with the SBA construction loan. Petitioner further contends that his $ 75,000 payment to Jackson on September 15, 1980, was on behalf of TVI to induce Jackson to lease the Venture Inn from TVI while he continued to look for suitable exchange property. Respondent contends that the check represents an advance of the $ 75,000 cash payment called for under the exchange agreement and, therefore, does not increase petitioner's basis. Petitioner has failed to carry his burden of proof with respect to the $ 75,000 payment to Jackson. Unlike the exchange agreement, the lease agreement contains no reference to any such consideration. The financial statement of September 30, 1980, prepared by petitioners' certified public accountant, does not reflect this payment by petitioner as one made on TVI's behalf. In addition, petitioner has not explained why he would have rendered payment in September for a lease that was not entered *654 into until December. Accordingly, petitioner may not increase his basis by this amount. Petitioner further contends that his basis should be increased to include additional amounts he loaned to TVI. Petitioners have presented seven checks drawn by petitioner from February to August 1980 payable to TVI in the total amount of $ 29,283.47. Respondent contends that petitioner has failed to prove the purpose of these checks, the manner in which they were accounted for on TVI's books and records, or to demonstrate that these amounts were accounted for in the corporate audit. We find petitioner's testimony that during this period he contributed funds to TVI to be credible. However, petitioner has not shown that $ 8,784 of this amount does not duplicate the basis adjustment already made by respondent. Therefore, petitioner's basis in TVI was $ 51,708 as of December 31, 1980, and petitioner's portion of TVI's net operating loss in 1980 is limited to this amount. Sec. 1374(c)(2). Disposition of TVI's Assets
Respondent argues that, on November 15, 1981, petitioner transferred TVI's assets and parcel B for the Norem Building in a like-kind exchange. Respondent contends that, *655 prior to November 15, 1981, TVI constructively distributed its assets to petitioner, the sole shareholder. Because TVI distributed its assets to petitioner, respondent determined that he realized and recognized gain upon the receipt of the assets. Petitioners contend that the exchange agreement was not consummated. Petitioner further contends that on November 15, 1981, he purchased the Norem Building by agreeing to the assumption of its existing debt, rather than accepting the property under the exchange agreement. It is petitioners' position that TVI did not dispose of its Venture Inn assets until August 30, 1982, when, under threat of repossession, the Venture Inn and parcel B were sold to the Chapmans in exchange for relief from all obligations encumbering the two properties. Petitioner argues, in the alternative, that TVI's assets were disposed of on March 30, 1982, when Lence released the deeds in escrow to Jackson. The parties have stipulated the amount of depreciation, asset classification and basis for TVI's assets as of November 15, 1981, March 30, 1982, and August 30, 1982. Accordingly, we need only determine the manner and date of disposition. We do not agree with *656 petitioners' characterization of the November 15, 1981, transaction. Petitioner initially may have been reluctant to accept the Norem Building as exchange property, but we are convinced that the exchange occurred. On and after November 15, 1981, petitioner exercised control over and acceded to rights and obligations of the Norem Building. In a similar fashion Jackson controlled the Venture Inn properties. As a result of the November 15, 1981, transfers, petitioner received the Norem property, Jackson received the Venture Inn, and TVI received nothing. To reach this result, TVI is considered to have constructively distributed its assets to petitioner. Despite petitioner's contrary arguments, the relevant documents and the record reflect an exchange of property as of the 1981 date. Accordingly, petitioner and TVI must recognize any realized gain on the distribution of the assets. We note that petitioner only argued that there was no exchange of property as of November 15, 1981. Petitioner did not contradict respondent's determination of the tax consequences that flowed from that transaction. Having found that there was a constructive distribution on November 15, 1981, we accept *657 respondent's computations. Section 301 deals with distributions of property made by a corporation to a shareholder with respect to its stock. The amount of the distribution is the amount of money received, plus the fair market value of the other property received. Sec. 301(b)(1)(A). The distribution amount is reduced, but not below zero, by the amount of any liability of the corporation assumed by the shareholder in connection with the distribution. Sec. 301(b)(2)(A). The taxable amount of the distribution is set out in section 301(c), as follows: (c) Amount Taxable. -- In the case of a distribution to which subsection (a) applies -- (1) Amount Constituting Dividend. -- That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income. (2) Amount Applied Against Basis. -- That portion of the distribution which is not a dividend shall be applied against and reduce the adjusted basis of the stock. (3) Amount In Excess Of Basis. -- (A) In General. -- Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated *658 as gain from the sale or exchange of property.
Section 316(a) defines a dividend as any distribution of property made by a corporation to its shareholders out of accumulated earnings and profits or out of current year earnings and profits. Respondent argues that, as a result of TVI's constructive distribution of its assets to petitioner, TVI distributed property subject to liabilities that exceeded its adjusted basis and TVI must, therefore, recognize gain. Sec. 311(c). This gain flows through to petitioner because it constitutes undistributed taxable income (UTI), in the amount of $ 147,810, and petitioner takes into income his pro rata share (in this instance -- 100 percent) at the end of the year. Sec. 1373. Under section 1376(a), petitioner's basis is increased by the amount required to be included in gross income under section 1373(b). Respondent further determined that, in addition to the dividend income under section 1373(b) of $ 147,810, petitioner received a constructive distribution of property from UTI. Petitioner argues that the fair market value of the TVI assets was less than the liabilities and, therefore, no property was received. Sec. 301(b)(2)(A). *659 We agree with respondent. Respondent determined the fair market value of the Venture Inn's assets by reference to the 1986 selling price of the Norem Building of $ 790,000. Respondent added $ 1,427,067, the amount of the Venture Inn's liabilities petitioner was relieved of, and reduced that amount by the liabilities encumbering the Norem Building which he assumed, to arrive at her determination that the Venture Inn's assets had a fair market value of $ 1,555,035. Respondent determined a property distribution of $ 127,968, the fair market value of the property less its liabilities ($ 1,555,035 - $ 1,427,067). Petitioners contend that the Norem Building had no value greater than the debts encumbering it. Petitioners contend that the Norem Building was a "bad bargain" because of the unfavorable lease terms. At trial, Appeals Officer Anita Teichrow testified as to the methodology used to arrive at respondent's determination. Ms. Teichrow explained that in selecting the 1986 selling price of the Norem Building, respondent selected the most conservative figure from the information available. Petitioner has not shown that respondent's methodology is unreasonable or that the determination *660 is in error. Petitioners, therefore, have not carried their burden on this issue. Having found that petitioner received a property distribution of $ 127,968 and a UTI distribution of $ 147,810, we must determine the tax consequences of the distributions. The notice of deficiency contains respondent's determinations with respect to the corporate income, and the treatment of the income flowing through to petitioner, and the constructive distribution of TVI's assets. Petitioner tried to recharacterize the transaction, but has not shown that these calculations are inaccurate. Respondent determined that petitioner has dividend income of $ 147,810 and that the remainder of the distribution is a return of capital. [9] Petitioner has not shown that respondent's determination is in error, and respondent's determination is sustained. *661 Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue and all rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. So-called Starker exchanges derive their name from Starker v. United States, 602 F.2d 1341 (9th Cir. 1979), wherein it was held that the reciprocal transfer of property need not be simultaneous to defer gain or loss under sec. 1031↩.
3. In the notice of deficiency respondent determined that petitioner assumed liabilities of $ 622,032.96 in connection with the Norem Building. Based on this mathematical error, respondent in the notice of deficiency adjusted petitioners' income to reflect a $ 40,000 capital gain, which adjustment respondent now concedes.↩
4. There is little in the record in regard to Bear Country Corp.; however, it is identified in the exchange agreement as a Montana corporation with the location of its principal office being the same as that of Berja Investments. In addition, it, not Jackson, is identified in the exchange agreement as the owner of an undivided 50-percent interest in the Venture Inn.↩
5. The Real Estate Sales Agreement executed on Dec. 10, 1981, between Jackson and Henry and Mildred Ostle and the exchange agreement executed on Jan. 20, 1982, between Berja and Bear County and Parmelee were not recorded.↩
6. The return describes what has been referred to in this opinion as the Norem Building as "Commercial Building-Bozeman".↩
7. Sec. 1374(c)(2) provides as follows: (2) Limitation. -- A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of -- (A) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of the shareholder's stock in the electing small business corporation, determined as of the close of the taxable year of the corporation, (or, in respect of stock sold or otherwise disposed of during such taxable year, as of the day before the day of such sale or other disposition), and (B) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation (or, if the shareholder is not a shareholder as of the close of such taxable year, as of the close of the last day in such taxable year on which the shareholder was a shareholder in the corporation).↩
8. See also Putnam v. Commissioner, 352 U.S. 82 (1956); Underwood v. Commissioner, 535 F.2d 309 (5th Cir. 1976), affg. 63 T.C. 468 (1975); Perry v. Commissioner, 47 T.C. 159 (1966), affd. 392 F.2d 458 (8th Cir. 1968); Borg v. Commissioner, 50 T.C. 257↩ (1968).
9. Respondent concedes that the remaining $ 19,842 in basis may be allowable as a capital loss at some point. However, because of questions of timing and other factors, respondent has not allowed the loss to petitioners in the years in issue. Petitioner argues that any loss attributable to the stock would be a sec. 1244 loss. Petitioners have not shown that the stock was issued under a written plan or that the other regulatory requirements were met. Accordingly, petitioner's stock does not qualify as sec. 1244 stock.↩